UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

NOREEN SHEA,

    Plaintiff,

vs.

VILLAGE OF POMONA, BRETT YAGEL,

    Defendants.

-------------------------------------------------------------x

18 cv 11170 (CS)

### AFFIDAVIT OF NOREEN SHEA IN OPPOSITION TO DEFENDANTS' MOTION'S FOR SUMMARY JUDGMENT

STATE OF NEW YORK  )
                               ) ss:s.
COUNTY OF ORANGE  )

Noreen Shea, having been duly sworn, hereby states and deposes under the pains and penalties of perjury:

1. I am the plaintiff in this lawsuit and make this Affidavit to my personal knowledge. I have reviewed the statements of allegedly undisputed facts presented by defendants and many are in fact disputed. I have also reviewed the Counterstatement of Material Facts presented by my counsel and affirm that the statements made therein relating to my experience are true to my knowledge. I also understand that the purpose of this Affidavit is not to repeat what I have already testified to at deposition. However, I was not asked relevant questions at my deposition and this Affidavit will address those issues and elaborate upon some of the testimony I provided then.

1

2. As I explained at my deposition, Village Clerk Artha was very much part of the problem I encountered. She was cold to the public, very hostile toward me and unhelpful in the extreme. I did use the words "cold hearted Hannah" to describe, not mock, her because Arsa Artha treated me in an unrelentingly cruel manner and played along with the bigotry in the office. I am aware that Ms. Artha denies being present when Zummo imitated Orthodox/Hasidic Jews. She was routinely present. I am aware she denies knowing of the Mayor's orders to delay FOIL responses and processing applications for Orthodox/Hasidic Jews. This is false, as she was present when these statements were made.

3. I read a claim that I rolled out a defective app and that this upset the Mayor and contributed to my termination. This is nonsense. In July 2016, while Artha was on vacation, an employee of the Rockland County Solid Waste Authority contacted the office and advised that his agency wished to provide village residents with virtual access to information concerning their garbage pick-up. The Authority then rolled out an application which allowed village residents access to this information. Learning of this, defendant Yagel claimed that the information on the application was "garbage" and directed Artha to contacted the Authority and give them the correct information on garbage pick-up times. He wrote, "They missed the boat on this one. The fact that they rolled this out without us being able to verify the information is extremely problematic. I will be in contact with the County Executive on this matter." See Exhibit 1. I was not

2

responsible for this roll out, did not provide any erroneous information in relation to it and have no idea whether defendant Yagel made any contact with anyone about it.

4. In my deposition, I extensively discussed the FOIA issues; the problem was never that I failed to search appropriate files or inadequately responded to a request. Responding to paragraph 17 of the Village Rule 56.1 statement, Yagel claims that he spoke with me about completing a FOIL request in which I responded to a customer at the counter, made them a copy of the requested information, collected 25 cents, and sent them on their way. Defendant Yagel claims to have complained because I did not search "all the files" before responding to the request. But at his deposition, Yagel did not know what this request was for and he never asked to see this request. Therefore, he could not judge whether I responded appropriately to the request was proper or improper. In fact, in this instance, I fully responded to a specific and limited request. As I explained at deposition, Yagel's complaint was that I was too efficiently and courteously serving Orthodox/Hasidic Jews who made requests and that I should be delaying my response as a micro-aggression toward the requester. This was part of a much larger pattern of his wanting to take any possible action/omission to delay service to members of this community, resulting frequently in extensive delays in property inspections and approval of what should have been routine applications. Building Inspector Zummo was Yagel's partner in

3

this process, though Zummo did express on occasion both an understandding that what he was doing [and being directed to do] was wrong.

5. In paragraph 24 of the Village's Rule 56.1 Statement, it is claimed that I got angry when being told to follow protocol. This statement is false. I was actually angered and frustrated by the failure to the Village Clerk to cross-train me. The specific incident referenced by the testimony cited in this paragraph relates to an incident which allegedly occurred about one year before plaintiff was terminated and before Artha went on her two week vacation in June-July 2016. In her deposition, Artha claims that she told me that a specific check had to be signed by either the Mayor or Deputy Mayor. Artha claimed that she placed the check in the deputy mayor's mailbox and that I wanted the check to remain on my own desk, causing Artha to express concern that if left there, the check might get lost. Artha claims it was then village protocol to keep the unsigned check in the mailbox. Artha claims that I became very angry and began mocking and dismissed this protocol. Artha admits she told me that I was acting like an "asshole." This incident never happened, though Artha provided me inadequate training before she left for her vacation and did apologize to me for that unprofessional behavior after she returned.

6. In paragraph 25, defendant Village claims I had an "anger management issue." I have no such issue and this was never discussed with me by anyone.

4

7. In paragraph 26, the Village contends that Zummo did not report his daily activities to Yagel, and Yagel did not ask him about his daily activities. This is pure fiction. Zummo told me, indeed repeatedly complained to me that defendant Yagel wanted to know every detail of his activities, particularly with regard to any Jewish developers and their properties. Yagel constantly interfered with Zummo's schedule, directed me and Zummo to alter that schedule to delay scheduled inspections of properties owned by Jews, directed Zummo to find violations of properties of Jewish developers, directed Zummo to engage in what was called a "shul patrol" on the Sabbath during which Zummo went to religious sites and wrote violations and otherwise controlled Zummo's activities.

8. In paragraph 27, the Village claims that Yagel told Zummo it was inappropriate to mimic "people." First, Zummo repeatedly mimicked Orthodox/Hasidic Jews. This often occurred in defendant Yagel's presence. I concluded that Zummo did this to solidify his status with Yagel who joined in and never seemed the least offended by this behavior. I certainly never heard Yagel correct or chastise Zummo for mimicking Jews in his presence.

9. Zummo worked part time, about 15 hours/week. So, he was not present all the time, quite the contrary. Zummo was not present for Yagel's "pork rinds" and I have never stated otherwise.

10. Yagel never suggested to me that I was on thin ice or that he or Zummo had any serious issues with my job performance. Nor did Zummo

make any such comments to me as related to my job performance. As I explained at my deposition, on three or four occasions, Zummo to me that Yagel was calling me a "Jew lover" and suggested that I look for other employment. At my termination meeting, despite my inquiry, Yagel gave me no reason for his action.

11. In paragraph 32, defendant Village claims that I engaged in a screaming match with Yagel in front of Zummo over my handling of some unspecified call. This incident occurred in the fall 2016 as follows: defendant Yagel was standing at the counter talking to Lou Zummo, and Fran was also in the office next to me. I answered the village phone and **again** it was Mr. Sunshine (an Orthodox Attorney), a village resident. He had called the previous day because he kept getting water in his basement. He reported that two plumbers had come to his home and reported that there was nothing wrong with anything in his home. The sewer company had been outside for the last few days on his street doing maintenance. I believe I asked him to hold on and wanted Lou to talk to him. The mayor stated he should flush the toilet a few times that should make the brown water go away. I told the mayor he called yesterday and today, and I believe he was on his third plumber. When I got back on the phone with Mr. Sunshine, Yagel started waving his hands at me, trying to get me to put him on hold again, he was punching the counter and turning red, making the hand gestures to hang up, or put on hold, but Mr. Sunshine was explaining to me what all three plumbers did, and I did not want to interrupt him. The Mayor

6

was pounding his fist and infuriated turning beet red, so I interrupted Mr. Sunshine, put the call on hold, and yelled at the mayor, " What the hell is your problem"........he yelled back 'HE IS AN ATTORNEY." I yelled back at him that I needed to finish my conversation and assist the man on the phone. The Mayor never discussed this incident with me again.

12. In paragraph 33, defendant Village claims that Zummo complained to Yagel about my computer entries at least 2-3x a month. Yagel never spoke with me about any this issue.

13. Zummo told me that Artha continually reported all of the activities of the office to the Mayor in real time. I saw Artha texting repeatedly at the work place and this observation was entirely consistent with Zummo's statement to me. In addition, on a number of occasions, Yagel would call me and query my contact with an Orthodox/Hasidic person though he was not at the office. This confirmed that Artha was engaging in precisely this conduct. She and I were the only employees present preceding such calls.

14. As noted above, Artha participated in the pervasive anti-semitism which I observed. Artha commented to me repeatedly that Jewish residents were impatient and wanted service more quickly than she wished to provide it.

15. Defendant Yagel and Louis Zummo, my supervisor and the building inspector, repeatedly directed me to slow down the processing of applications, responses to FOIA requests or any other service she was engaged in performing for Hasidic/Orthodox people. In many instances, including, but not limited to,

7

Manes, Hirskowitz, Indig and Klein, Jewish applicants had to wait extensively for approvals of permits. The motives of Orthodox/Hasidic Jews were often question; one example was the continuous references to Klein's desire to build a "hotel," when he was merely raising the ceiling in a basement area. I often expressed concern with these directions, making clear that I saw no reason to delay processing responses to requests or applications and explaining that this only caused the delayed applicant to repetitively call our offices, making our operation less efficient. I also stated that these practices were unfair.

16. I never received a counseling memorandum or any other form of discipline and in April 2017, two months before her termination, the Village Board provided her a salary increase. Shea Affidavit, para. 16. At the same meeting, the Village Board did not provide Yagel with a requested salary increase. By then, Robert Klein, one of the targets of Yagel's anti-semitic conduct, had been elected to the Village Board and Yagel was beginning to lose control.

17. I note that my personnel file contains a lengthy response by Artha to my early February 2017 letter to the Village Board in which I complained about her. The Village Board never met with me or questioned me about anything in that document. Nor did Yagel meet with me to discuss issues she raised.

18. My complaints of anti-semitism went to the core of the Village. I understand that some in the Village were deeply concerned that Pomona would be "overtaken" by Orthodox/Hasidic families. I understood this to be what our country is about, the right to move to a community and settle there with one's

family. I also knew that if I raised my concerns about anti-semitism in a letter to the Board of Trustees or at a Board meeting, I would be fired. I had personal financial and parental pressure to deal with and did not want to be fired in 2017. On the other hand, I could not sit by and do nothing. So, I decided to tape what I could because I knew these issues needed reckoning. I knew the Mayor was telling Manes to "sue me" and decided to gather evidence which would expose this despicable situation. I may not have had all the courage I should have, but what I have reported is real and affected many peoples' lives. I certainly reported what I knew to those affected and supported their efforts to gain redress. I made known to them at the time that I was "on their side" and would do what I could to reveal the truth of their oppression.

WHEREFORE defendants' motions for summary judgment should be denied and this matter scheduled for trial.

*Noreen Shea*
NOREEN SHEA

Signed and sworn to before me this 9th day of June 2020.

NOTARY PUBLIC

MICHAEL HOWARD SUSSMAN
Notary Public, State of New York
No. 02SU6332584
Qualified in Orange County
Commission Expires Nov. 09, 2023