UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
NOREEN SHEA,                                            18 cv 11170 (CS)

                            Plaintiff,

        -against-

VILLAGE OF POMONA, BRETT YAGEL,

                            Defendants.
-----------------------------------------------------------------x


## MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT


                                        MICHAEL H. SUSSMAN
                                        SUSSMAN & ASSOCIATES
                                        *Attorneys for Plaintiff*
                                        1 Railroad Avenue, Ste. 3
                                        P.O. Box 1005
                                        Goshen, New York 10924


Dated: June 10, 2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

COUNTERSTATEMENT OF FACTS ................................................................... 1

    A.  Plaintiff's hiring and reporting relationships ................................................. 1

    B.  Plaintiff's training and assignments ........................................................... 2

    C.  The anti-Semitic conduct of defendant Yagel defines the work environment ................. 3

    D.  Audio recordings corroborate plaintiff's account .............................................. 5

    E.  Before she was terminated, plaintiff complained to other Village Trustees and the Village Attorney about the anti-Semitism she observed and experienced ........... 16

    F.  Plaintiff's "expected" termination ............................................................ 16

    G.  Pretextual bases for adverse action ........................................................... 17

          1.  Death certificate issue .................................................................. 18

          2.  Responses to FOIL/FOIA requests .................................................... 18

          3.  Plaintiff di not roll out any app relating to garbage pick-up times .................. 19

          4.  Zummo did not complaint about plaintiff's scheduling of inspections ........... 19

          5.  Artha did not inform Yagel of alleged issues with plaintiff ......................... 20

    H.  NYSDHIR finds probable cause of religious discrimination by the Village against plaintiff ........................................................................ 22

    I.  Defendants' treatment of plaintiff was part of a broader pattern of their adjudicated anti-Semitism ..................................................................... 22

STANDARD OF REVIEW .................................................................................. 29

ARGUMENT ....................................................................................................32

    Point I

    Plaintiff has made out a prima facie case of discrimination ............................32

    Point II

    A reasonable jury could conclude that defendants' asserted bases for
    terminating plaintiff are pretextual ..................................................................32

    Point III

    A reasonable jury could conclude that plaintiff was discriminated
    against as she alleges .......................................................................................33

    Point IV

    Yagel's conduct violates the Equal Protection Clause ....................................34

    Point V

    Yagel cannot claim qualified immunity...........................................................38

    Point VI

    Punitive damages are available against Yagel .................................................40

    Point II

    Pomona's motion should likewise be denied...................................................40

CONCLUSION.................................................................................................42

## TABLE OF AUTHORITIES

### Cases

African Trade & Info Ctr. Inc. v. Abromaitis,
 294 F.3d 355 (2d Cir. 2002) ....................................................................................38

Anderson v. Liberty Lobby, Inc.,
 477 U.S. 242 (1986) ...............................................................................................31

Bale v. Nastasi,
 982 F. Supp. 2d 250 (S.D.N.Y. 2013) ....................................................................31

Berry v. Marchinkowski,
 137 F. Supp. 3d 495 (S.D.N.Y. 2015) ....................................................................29

Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1,
 16 F. Supp. 3d 294 (S.D.N.Y. 2014) ......................................................................29

Brandon v. Holt,
 469 U.S. 464 (1985) ...............................................................................................38

Brod v. Omya, Inc.,
 653 F.3d 156, (2d Cir. 2110) ............................................................................29, 30

Bucher v. Krause,
 200 F.2d 576 (7th Cir. 1952) ..................................................................................39

Burlington Coat Factory Warehouse Corp. v. Espirit de Corp.,
 769 F.2d 919 (2d Cir. 1985) ..............................................................................41, 42

Carrero v N.Y. City Housing Authority,
 890 F.2d 569 (2d Cir. 1989) ...................................................................................35

Celotex Corp. v. Catrett,
 477 U.S. 317 (1986) ...............................................................................................30

CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP,
 735 F.3d 114 (2d Cir. 2013) ...................................................................................29

Cine SK8 Inc. v. Town of Henrietta,
 507 F.3d 778 (2d Cir. 2007) ...................................................................................34

City of Newport v. Fact Concerts, Inc.,
 453 U.S. 247 (1981)................................................................................................39

Congregation Rabbinical Coll. of Tartikov v. Village of Pomona,
    280 F.Supp.3d 426 (S.D.N.Y. 2017) .........................................22, 23, 24, 25, 26, 27, 28, 40

Contemporary Mission, Inc. v. U.S. Postal Service,
    648 F.2d 97 (2d Cir. 1981) ..........................................................................................42

Doe v. Village of Mamaroneck,
    462 F.Supp.2d 520 (S.D.N.Y.2006) ............................................................................37

Engquist v. Oregon Dep't of Ag.,
    553 U.S. 591 (2008)..........................................................................................37, 38, 39

Filco v. Amana Refrigerator, Inc.,
    709 F.2d 1257 (9th Cir. 1983) .....................................................................................42

Fincher v. Depository Trust & Clearing Corp.,
    604 F.3d 712 (2d Cir. 2010) ........................................................................................31

Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.,
    386 F.3d 485 (2d Cir. 2004) ........................................................................................30

Gentile v. Nulty,
    769 F.Supp.2d 573 (S.D.N.Y. 2011) ...........................................................................36

Gierlinger v. New York State Police,
    15 F.3d 32 (2d Cir. 1994) ............................................................................................35

Guardian Life Ins. Co. v. Gilmore,
    45 F. Supp. 3d 310 (S.D.N.Y. 2014) ...........................................................................30

Hayden v. County of Nassau,
    180 F.3d 42 (2d Cir. 1999) ..........................................................................................34

Jeffreys v. City of New York,
    426 F.3d 549 (2d Cir. 2005) ........................................................................................31

Kassel v. City of Middletown,
    272 F. Supp. 3d 516 (S.D.N.Y. 2017) .........................................................................31

Lyon Ford, Inc. v. Ford Motor Co.,
    342 F. Supp. 1339 (S.D.N.Y. 1971) ............................................................................42

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986)......................................................................................................30

iv

Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,
    164 F.3d 736 (2d Cir. 1998) ........................................................................30

Oreck Corp. v. Whirlpool Corp.,
    639 F.2d 75 (2d Cir. 1980) .........................................................................42

Price v. Worldvision Enterprises, Inc.,
    455 F. Supp. 252 (S.D.N.Y. 1978) .............................................................42

Psihoyos v. John Wiley & Sons, Inc.,
    748 F.3d 120 (2d Cir. 2014) .......................................................................29

Pyke v. Cuomo,
    567 F.3d 74 (2d Cir. 2009) .........................................................................34

Reeves v. Sanderson Plumbing Prods.,
    530 U.S. 133 (2000) ..............................................................................31, 32

Rose v. Garritt, No.
    16-cv-03624, 2020 U.S. Dist. LEXIS 12806 (S.D.N.Y. Jan. 23, 2020) ............................31

Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene,
    746 F.3d 538(2d Cir. 2014) ........................................................................30

San Antonio Independent School Dist. v. Rodriguez,
    411 U.S. 1 (1973)..................................................................................37, 38

Saulpaugh v. Monroe Com'y. Hosp.,
    4 F.3d 134 (2d Cir. 1993) ...........................................................................35

Savino v. Town of Southeast,
    983 F.Supp.2d 293 (S.D.N.Y. 2013) ........................................................35, 36

Scott v. Coughlin,
    344 F.3d 282 (2d Cir. 2003) .......................................................................31

Scott v. Harris,
    550 U.S. 372 (2007).....................................................................................30

Smith v. Wade,
    461 U.S. 30 (1983)......................................................................................40

Silver v. Cormier,
    529 F.2d 161 (10th Cir. 1976) ....................................................................39

<u>United States v. City of Yonkers,</u>
    96 F.3d 600 (2d Cir.1996) ................................................................................36, 37

<u>Vital v. Interfaith Med. Ctr.,</u>
    168 F.3d 615 (2d Cir. 1999) ....................................................................................31

<u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.,</u>
    373 F.3d 241 (2d Cir. 2004) ...................................................................................29

<u>Wilson v. New York,</u>
    2018 U.S. Dist. LEXIS 49609 (E.D.N.Y. Mar. 26, 2018)................................35

<u>Wright v. Goord,</u>
    554 F.3d 255 (2d Cir. 2009) ...................................................................................30

<u>Wrobel v. County of Erie,</u>
    692 F.3d 22 (2d Cir. 2012) .....................................................................................30

<u>Yeshiva Chofetz Chaim Radin, Inc. v. Village of New Hempstead,</u>
    98 F. Supp. 2d 347 (S.D.N.Y. 2000) ....................................................................25

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56(a) ....................................................................................................29

**Federal Rules of Evidence**

Fed. R. Evid. 801(d)(2)(D) ...................................................................................41, 42

## PRELIMINARY STATEMENT

This matter comes before the court on separate motions by each defendant for summary judgment. The motions should be denied as, taken most favorably to plaintiff, the record establishes that defendant Yagel has a long history of anti-semitic behavior and terminated plaintiff because he believed she was a "Jew lover," who too efficiently serviced the job-related requests of Orthodox/Hasidic people. The direct evidence of discrimination comes from several sources: (1) the warnings, which started months before her termination by one of her supervisors, Village Building Inspector Louis Zummo, who told plaintiff that she needed to start looking for another job because the Mayor intended to fire her because she was a "Jew lover," (2) the direct statements made by defendant Yagel to Zummo and the plaintiff, directing them to delay responding to requests by Orthodox/Hasidic for property inspections or FOIA requests, and (3) the content of audio tapes made by plaintiff during the last six months of her employment, which demonstrate ongoing stereotypic comments and mocking of Orthodox/Hasidic people by Yagel and Zummo.

## COUNTERSTATEMENT OF FACTS

### A. Plaintiff's hiring and reporting relationships.

Plaintiff and Nick Wilson, a member of the Village Board of Trustees, were "old friends" as of late 2015. See Shea Deposition at 9. At a New Year's Eve Party on December 31, 2015, Wilson suggested that plaintiff's background made her an ideal candidate for the position of Deputy Clerk. Id. at 10, 35-36. Plaintiff then interviewed at Village Hall with Mayor Yagel, deputy Mayor Leon Harris and Village Clerk Francis Arsa Artha. Id. at 13. At the interview, Yagel told plaintiff that the Village had a lot of problems that somebody needed to clean up,

1

specifically "expired permits." Id.  After the interview, the Mayor called and offered her the job, telling her she would be working for the Building Inspector, Louis Zummo. Id. at 16.

Plaintiff commenced work on February 1, 2016. Id. at 22, 30.  As deputy clerk, she worked from 9-4 each day and earned $50,000. Id. at 16.  Plaintiff understood Zummo was her "boss," Artha claimed she was plaintiff's boss and the Mayor stated he was the boss. Id.  at 26. To plaintiff, everyone was her boss, but she reported mostly to the Building Inspector. Id.

**B.  Plaintiff's training and assignments.**

The first priority for plaintiff was to close out expired building permits with the Building Inspector. Id. at 17.  Her predecessor gave her training, which was a "joke." Id. at 18.  When asked to describe the training, plaintiff explained, "I'd say we cleaned off her desk . . . she'd be singing and dancing in the office and I'd be looking at Fran like . . . she has to show me what we're doing here.  We basically cleaned her desk that was stacked this high [three or four feet] you couldn't see it." Id. at 19.

Carol told plaintiff about the application for building permits. Id. at 20.  When plaintiff asked her what to do with the completed application, Carol told her "you stick it up your ass." Id.

Plaintiff was not cross-trained to do the job of the Village Clerk, Arsa Artha, though this was the contemplation for her position. Id. at 26-27, 152.  Zummo told plaintiff that Artha would never cross-train her. Id. at 154, ll. 17-19.

About a year after she started with the Village, Artha gave plaintiff two typed sheets of paper which said "duties of the deputy clerk" and told her to type the list immediately and email it to defendant Yagel. Id. at 28-29.  Plaintiff started to scan the already typed paper to the Mayor. Id. at 29.  Artha directed her to re-type it; plaintiff explained she did not understand. Id.  She had not received training on each of these alleged job duties. Id. at 29.

2

Building permits were supposed to be issued 30 days after the filing of a complete application. Id. at 36. Plaintiff worked closely with Zummo in setting up a schedule for him to do property inspections. Id. at 44. She scheduled inspections on an as needed basis, entered those scheduled on an Outlook calendar and sent the schedule to both Zummo and Yagel. Id. at 47-48. Zummo never complained to plaintiff about the way she was scheduling inspections. Id. at 47.

Plaintiff never received a counseling memorandum or any other form of discipline and, in April 2017, two months before her termination, the Village Board provided her a salary increase. See Shea Affidavit ¶ 16.

### C. The anti-Semitic conduct of defendant Yagel defines the work environment.

Defendant Yagel was present a great deal at the office. See Shea Deposition at 50-51, 58. He often stood at the counter where the public sought service. Id. at 58. Defendant Yagel frequently interfered with the inspection schedule, calling Zummo into his office when the Building Inspector was supposed to be conducting an inspection. Id. at 47. In many instances, including, but not limited to, Manes, Hirskowitz, Indig and Klein, Jewish applicants had to wait extensively for approvals of permits. See Shea Affidavit ¶ 15. When asked to explain why Klein's application was so delayed, plaintiff recalled "all the sarcastic comments," a reference to claims by Yagel and Zummo that Klein was building a "hotel." See Id.; Shea Deposition at 41.

Another Orthodox Jew, Hirskowitz, was building 41 homes in the Village and had a substantial need for inspections by Zummo. See Shea Deposition at 49. On one occasion, after another inspection cancelled, plaintiff scheduled Zummo to do an inspection of one of Hirskowitz's properties the following day. Id. at 49. Yagel interfered, questioning why plaintiff "put him on so fast." Id. at 50.

3

Frequently, Yagel told plaintiff that "you can make them wait, a week or ten days." Id. At first, plaintiff did not understand why the Mayor would interfere in this manner with the scheduling, and Yagel would not explain his direction to delay. Id. at 51, 54.  He would simply say, "you can make them wait ten days." Id. at 54.

Plaintiff asked Zummo why the Mayor was behaving in this manner. Id. at 51-52. Zummo replied, "you're helping the Jews, that's why," and he would make that statement using a Jewish accent. Id. at 52.  Plaintiff would explain that she scheduled the appointment because of a cancellation and Zummo would tell her "no, no, no." Id.  Asked for other examples of the same issue, plaintiff responded, "A lot ---honestly all the FOIL requests, all the inspections." Id.

Zummo explained to plaintiff that there were four or five levels of Jews and "the lowest are the real Hasids" and he did this "whole impression" of them. Id. at 53.

When asked what direct comments Yagel made which suggested his anti-semitism, plaintiff recalled "the classic one" – "Go buy pork rinds for our guests when they come in, ha, ha ha." Id. at 56.  Ninety-nine percent of the people who came to the counter asking for help were Hasidic or Orthodox Jews. Id.  While Yagel did not say, "don't give the Jews permits," plaintiff explained that you felt anti-semitism permeating the environment. Id. at 57.

Plaintiff recalled promptly processing eighteen FOIL requests and Artha directing her to make the requestor wait and counting the number of days left before plaintiff had to respond to each. Id. at 57-58.  Likewise, applicants would call the office inquiring about their permits and, when plaintiff would ask Zummo for the status, he would respond that he could not issue a permit too fast or the Mayor would kill him. Id. at 60.

Zummo and Yagel together impersonated Jews: "they always did their – 'we got the monies' – you know, they were always doing this banter back and forth . . . ." Id. at 61.  Zummo

4

frequently imitated Jews at work on various occasions, several times in the presence of the Mayor. Id. at 121-22.

Plaintiff related that a Jewish woman came into the office and told plaintiff she was selling Avon.  After she left, Zummo "was like, see, all the Jews they go to make the monies. Even the wife has to make the monies.  Everybody's got to make the monies.  And he would just walk around the office doing this." Id. at 122.  According to Shea, "[E]very day it was that environment and so you saw, you felt it, you knew it." Id.

Right after she started working, the Mayor told plaintiff to record the Orthodox when they came into the office. Id. at 155, 156.  Specifically, he directed her to record that "bitch," Naomi Streiker, when she entered Village Hall. Id. at 190-91.  Yagel showed plaintiff how to make recordings on her phone. Id.  She recorded a few interactions with Orthodox people, decided doing so was wrong, and then began recording the Mayor. Id. at 155-56.

Plaintiff responded to FOIL requests relating to the responsibilities of the Building Department, the Planning Board and the Zoning Board of Appeals. Id. at 67-68.

Plaintiff observed little progress on closing expired permits. Id. at 71-72.  Zummo was part-time and reluctant to work on them. Id. at 72.  Plaintiff explained Zummo's reluctance to Yagel. Id.  When asked why there was such a backlog in permits, plaintiff responded, "You felt this anti-semitism. They're taking over. They're taking over the village.  The Orthodox are taking over the village.  It was a slow-down process." Id. at 73.

**D.  Audio recordings corroborate plaintiff's account.**

In or about late January 2017, plaintiff commenced taping Yagel and Zummo because she found their conversations offensive and wanted to record their antisemitic comments. See Shea

Deposition at 191.  The recordings are date and time stamped on plaintiff's phone, id. at 189, and she was present when she recorded the conversations, id. at 193.

Plaintiff heard Yagel make derogatory comments about a number of Hasidic/Orthodox developers/landowners, including, but not limited to, Manes, Indig, Klein and Hirskowitz.  See Id. at 195-216; See also Shea Recordings: Feb. 1 at 25:10-26:00; Feb. 2, Part 2 at 11:00-12:00; Feb. 3, Part 1 at 43:00-45:00; Feb. 3, Part 1 at 1:10:00-1:14:00; Feb. 3, Part 2 at 16:30-17:00; Feb. 3, Part 2 at 39:00; Mar. 31 at 10:00-10:30; Mar. 31, Part 1 at 48:00-48:30.  These stereotypic comments typically involved their desire to violate the law for the sake of making money.  See Shea Affidavit ¶ 14; See also Shea Recordings: Feb. 3, Part 1 at 1:10:00-1:14:00; Feb. 3, Part 2 at 39:00-40:00; Feb. 14, Part 2 at 38:00-39:00.


On February 1, 2017, Defendant Yagel discussed alleged property violations at the home of a Jewish resident with Building Inspector Zummo.  See Shea Recording, Feb. 1 at 0:00-2:00. Upon learning the size of new additions to the home, Defendant Yagel remarked, "Is he building it for a Synagogue?"  See Shea Recording, Feb. 1 at 0:50.  Yagel was aware that this property was a residence and not a designated place of worship.  See Shea Recording, Feb. 1 at 0:00-2:00.

On the same day, Yagel spoke with an official at the Town of Ramapo to discuss a list of tax-exempt properties.  See Shea Recording, Feb. 1 at 1:17:20.  He asserted that some single-family homes were being given tax-exempt status by claiming to be houses of worship, see Shea Recording, Feb. 1 at 1:17:50, thus implying that residents of these homes were "trying to skirt the law," see Shea Recording, Feb. 1 at 1:23:30.

On February 3, 2017, Yagel and Zummo discussed a code violation that Zummo had recently given out in the Village of Airmont.  See Shea Recording, Feb. 3, Part 1 at 43:00-44:00.

At this time, Zummo worked part-time as the Building Inspector in the Village of Airmont, as well as part-time as the Building Inspector in the Village of Pomona. See Zummo Transcript at 56-57. Zummo laughed as he told Yagel that "a Hasidic house-flipper" in the Village of Airmont had recently been fined $12,500 for violating a stop-work order and for working without a permit. See Shea Recording, Feb. 3, Part 1 at 44:00. Yagel responded, "That's what we need over here," in reference to the Village of Pomona. See Shea Recording, Feb. 3, Part 1 at 44:17. Yagel then stated that he wanted to start "banging these house-flippers," implying that he wanted to issue large fines to Hasidic contractors. See Shea Recording, Feb. 3, Part 1 at 44:19. Zummo responded, "We gotta stop people like that," suggesting that the Village should take action against Hasidic contractors. See Shea Recording, Feb. 3, Part 1 at 44:50.

In the same conversation, when referring to a property being worked on by a Jewish builder, Yagel stated, "I want the maximum on that property. The absolute maximum." See Shea Recording, Feb. 3, Part 1 at 45:03. Thus, Yagel directed that Zummo should issue the largest fine possible to the Jewish builder.

On the same day, Defendant Yagel was present when two Jewish residents entered the office and went to the counter for assistance. See Shea Recording, Feb. 3, Part 1 at 51:40. The residents asked Plaintiff and Zummo questions about Village rules concerning the placement of shipping containers, mobile homes and tiny homes on a specific property. See Shea Recording, Feb. 3, Part 1 at 52:00-1:01:00. Zummo answered their questions and told the residents that the Village does not permit shipping containers, mobile homes, or tiny homes on properties, unless they are built behind a larger main home. See Shea Recording, Feb. 3, Part 1 at 52:00-1:01:00. The residents thanked plaintiff and Zummo for their help and left. See Shea Recording, Feb. 1, Part 1 at 1:01:00.

Yagel later inquired what the residents needed help with. See Shea Recording, Feb. 3, Part 1 at 1:10:55.  Zummo did a mocking impersonation of one of the men asking to put 4-5 tiny homes on one property. See Shea Recording, Feb. 3, Part 1 at 1:11:00-1:12:20.  Yagel did not address the inappropriate impersonation or the mocking tone of his employee. See Shea Recording, Feb. 3, Part 1 at 1:11:00-1:12:20.  Rather, he stated, "People like that, look at the code. Don't even give them information." See Shea Recording, Feb. 3, Part 1 at 1:12:25.  Thus, Yagel directed that Zummo and plaintiff should not assist Jewish residents or answer their questions.

Referring to the two Jewish residents who had exited the room, Yagel continued, "These two bozos that come in here, they can FOIL.  Our laws are online.  Please don't give any more information out because--let them talk, and as much as they're going to aggravate, don't say a fucking word.  Because they're trying their hardest.  You know they're trying their fucking hardest". See Shea Recording, Feb. 3, Part 1 at 1:13:09.  And he instructed Zummo and plaintiff to give Jewish residents additional paperwork instead of answering their questions directly. See Shea Recording, Feb. 3, Part 1 at 1:13:09.  He further implied that the two Jewish residents had been attempting to aggravate or trick Zummo and plaintiff. See Shea Recording, Feb. 1, Part 1 at 1:13:09.  The two Jewish residents were friendly with Zummo and plaintiff and had done nothing to suggest that they would violate Village law. See Shea Recording, Feb. 3, Part 1 at 52:00-1:01:00.

On the same day, February 3, 2017, Yagel and Zummo discussed the progress of projects of a Jewish builder, Mr. Hirskowitz. See Shea Recording, Feb. 3, Part 2 at 39:03-39:10.  Yagel expressed surprise that this builder had moved his projects along so quickly. See Shea Recording, Feb. 3, Part 2 at 39:03-39:10.  Referring to the speed of the project, he sked Zummo:

"There's two more fucking houses. What the hell is going on?" <u>See</u> Shea Recording, Feb. 3, Part 2 at 39:13.  Zummo responded, "He's making monies." <u>See</u> Shea Recording, Feb. 3, Part 2 at 39:15.  Instead of addressing his staff member's Jewish stereotype, Yagel responded, "That's fine, but I have to call and thank him for saving me a plot in the cemetery," then laughed. <u>See</u> Shea Recording, Feb. 3, Part 2 at 39:18.  This comment was a reference to the fact that the Village was then suing the same Jewish builder for building on an alleged cemetery. See Shea Recording, Feb. 2, Part 1 at 19:45-20:40.

On the same day, Yagel was present in the office when the phone rang. <u>See</u> Shea Recording, Feb. 3, Part 2 at 16:25.  After plaintiff answered, Defendant Yagel directed her, "I bet it's Schlomo Fuerst.  If it is, hang up." See Shea Recording, Feb. 3, Part 2 at 16:55.  Zummo told Yagel that Mr. Fuerst's first name is Solomon, not Schlomo, to which Yagel replied, "Whatever," in an annoyed tone. <u>See</u> Shea Recording, Feb. 3, Part 2 at 17:00-17:01.

Later the same day, Yagel learned that Zummo had scheduled a meeting with Mr. Fuerst, a Jewish realtor, to discuss a specific property. <u>See</u> Shea Recording, Feb. 3, Part 2 at 40:00.  He again referred to Mr. Fuerst as "Schlomo" and was again corrected by Zummo. <u>See</u> Shea Recording, Feb. 3, Part 2 at 40:00.   Yagel asked Zummo why he was meeting with Mr. Fuerst and whether Mr. Fuerst owns any property in the Village. <u>See</u> Shea Recording, Feb. 3, Part 2 at 40:18-40:25.  Zummo told Yagel that Mr. Fuerst owns four lots of property in the Village. <u>See</u> Shea Recording, Feb. 3, Part 2 at 40:29.  Zummo also told Yagel that he agreed to meet with Mr. Fuerst and a Jewish doctor who was interested in purchasing a million-dollar home in the Village. <u>See</u> Shea Recording, Feb. 3, Part 2 at 40:38.

Yagel responded, "You are not their personal building inspector," and directed Zummo not to meet with Mr. Fuerst. <u>See</u> Shea Recording, Feb. 3, Part 2, 41:38-42:00.  And he told

9

Zummo: "Have him put it in writing. Have them put everything in writing. They have questions, they can put it in writing." See Shea Recording, Feb. 3, Part 2 at 42:42.  Zummo explained that the potential buyer needed to see the building plans submitted to the Village because the previous homeowner was unable to provide accurate records and the buyer needed to know of any violations on the property. See Shea Recording, Feb. 3, Part 2 at 46:20-46:35.  Yagel instructed his staff to delay working with Mr. Fuerst and the Jewish doctor. See Shea Recording, Feb. 3, Part 2 at 42:42.

On February 6, 2017, Zummo discussed with plaintiff setting up a Technical Advisory Committee ("TAC") meeting for a Jewish resident, Mr. Ecker. See Shea Recording, Feb. 6 at 27:00.  The TAC meeting was necessary for Mr. Ecker to gain approval of his plans to pave the roads near his home. See Shea Recording, Feb. 6 at 28:00-28:30.  Plaintiff suggested to Zummo that she could contact Mr. Brady, the Acting Village Engineer, to work out scheduling, and Zummo agreed with this plan. See Shea Recording, Feb. 6 at 29:00-29:02.  She began to search for Mr. Brady's phone number. See Shea Recording, Feb. 6 at 29:30.

Yagel later called the office and asked plaintiff why she needed Mr. Brady's number. See Shea Recording, Feb. 6 at 1:15:03-1:15:25.  Plaintiff picked up the phone and told Yagel that they needed the number to schedule Mr. Ecker's TAC meeting. See Shea Recording, Feb. 6 at 1:15-03-1:15:25.  Yagel then asked to speak with Zummo, who picked up the phone and told Yagel that the TAC meeting was necessary to discuss the paving of the road leading to the site for Mr. Ecker's home. See Shea Recording, Feb. 6 at 1:15:43-1:16:00.  Zummo spoke with Yagel for several minutes and discussed Mr. Ecker's plans to pave High Mountain, then hung up. See Shea Recording, Feb. 6 at 1:16:00-1:17:50.  Plaintiff asked Zummo again about Pat Brady's phone number and Zummo responded, "You ain't getting' it." See Shea Recording, Feb. 6 at

1:19:58-1:20:00.  Having spoken with Yagel, Zummo reversed his position and told, "Brett said no TAC meeting." See Shea Recording, Feb. 6 at 1:20:04.  He told plaintiff that Defendant Yagel had said, "Nobody's rushing to give Mr. Ecker a TAC meeting." See Shea Recording, Feb. 6 at 1:20:12.  He also told plaintiff that Yagel would not allow a TAC meeting to happen until attorneys looked into Mr. Ecker's situation. See Shea Recording, Feb. 6 at 1:20:45.

Yagel returned to the office later that day and inquired of his staff, "So who's pushing the TAC meeting?" See Shea Recording, Feb. 6 at 2:28:40.  Plaintiff explained to Yagel that Mr. Ecker had asked her to schedule the meeting so that his plans could move forward. See Shea Recording, Feb. 6 at 2:28:50.  Yagel replied: "They don't have the right to tell you to set it up. No, absolutely not." See Shea Recording, Feb. 6 at 2:28:54-2:29:07.  Thus, Yagel directed Plaintiff not to schedule the meeting with Mr. Ecker. See Shea Recording, Feb. 6 at 2:28:54-2:20-07.  As such, Yagel instructed plaintiff and Zummo to unnecessarily delay the scheduling of a meeting for a Jewish resident. See Shea Recording, Feb. 6 at 2:28:54-2:20-07.

On February 10, 2017, Yagel personally called a resident, Steve Hodavonic, to discuss his appearance as a witness in a court case against Sima Abensen, an Orthodox realtor. See Shea Recording, Feb. 10, Part 1 at 7:12-7:55.  Mr. Hodavonic told Yagel that he was not able to attend court on the specified date, and Yagel responded that he would try to change the court date to ensure that Hodavonic could attend as a witness. See Shea Recording, Feb. 10, Part 1 at 8:20-8:55.  Yagel then called Christopher Riley, the prosecuting attorney, to try to change the court date. See Shea Recording, Feb. 10, Part 1 at 9:00-10:00.  While speaking with Mr. Riley, Yagel learned that Ms. Abensen was planning on pleading guilty at her next appearance. See Shea Recording, Feb. 10, Part 1 at 20:00.  Yagel told Mr. Riley, "Get her for the maximum fine, because she's a fucking idiot and she's a nasty, nasty bitch." See Shea

11

Recording, Feb. 10, Part 1 at 19:15.  He continued: "Full fine, baby. Five hundred bucks. That'll jerk her around." See Shea Recording, Feb. 10, Part 1 at 19:45.  Yagel was not the Village attorney and was not responsible for scheduling court dates or working out plea deals.

On February 13, 2017, Zummo told plaintiff that he would be meeting with the United Talmudical Association ("UTA") during the week and explained that the organization wanted approval and documentation for a school on Cherry Lane at the site of a former camp. See Shea Recording, Feb. 13 at 1:00:30-1:00:38. Zummo described himself as "the mean bastard stopping them from doing it." See Shea Recording, Feb. 13 at 1:00:40.  He told plaintiff about alleged issues with the UTA's documentation and said that he had explained it to them and their "fucking lawyers" multiple times. See Shea Recording, Feb. 13 at 1:00:50-1:01:10.  He then mocked a stereotypical response of the UTA in a Jewish accent: "I don't understand, why can't you do this for me? What would make it illegal?  Because it's a Jewish school?" See Shea Recording, Feb. 13 at 1:01:20-1:01:40. During the same conversation, Zummo mentioned wearing a "Hitler-was-right hat." See Shea Recording, Feb. 13 at 1:02:00.

On February 14, 2017, Yagel discussed with plaintiff the home of a Jewish resident, Aaron Cohen, which recently had a fire. See Shea Recording, Feb. 14, Part 1 at 8:49.  Plaintiff asked Yagel what happened at the home and where the fire took place. See Shea Recording, Feb. 14, part 1 at 8:49.  Yagel replied, "Cohen's a bitch." See Shea Recording, Feb. 14, Part 1 at 8:55. Later the same day, plaintiff discussed scheduling an early morning inspection of Mr. Cohen's home. See Shea Recording, Feb. 14, Part 2 at 38:12-38:20.  Yagel responded that plaintiff did not have to schedule it early in the morning, remarking: "Well Mr. Cohen wants it before the first, because you know why, that's when the tax assessment gets reduced.  That's why Aaron

12

Cohen is all over this." <u>See</u> Shea Recording, Feb. 14, Part 2 at 38:35.  Implying that Mr. Cohen was trying to cheat the Village of taxes, he added, "Why should the rest of us pay for it because you have fire damage?" <u>See</u> Shea Recording, Feb. 14, Part 2 at 38:50.

On March 1, 2017, Yagel and Zummo discussed a violation at the home of a Jewish resident. <u>See</u> Shea Recording, Mar. 1 at 8:25-9:20.  Zummo stated: "The Jewish mentality works that way. I could go over there every day and they're going to go and do what they want because they don't want restrictions. They're like 6-year-olds." <u>See</u> Shea Recording, Mar. 1 at 9:27. Yagel did not address this comment or correct his staff member's religious stereotyping. <u>See Id.</u>

The same day, a Hasidic resident entered the office while Yagel, Zummo and plaintiff were present. <u>See</u> Shea Recording, Mar. 1 at 34:30.  Zummo recalled inspecting the resident's kitchen on a previous occasion and spoke with her at the counter for several minutes. <u>See</u> Shea Recording, Mar. 1 at 34:34.  Both Zummo and Yagel spoke with the resident in a friendly tone and remarked on her unusual accent. <u>See</u> Shea Recording, Mar. 1 at 34:40-46:30.  The resident told them she had moved to the Village two years ago. <u>See</u> Shea Recording, Mar. 1 at 41:10. After the resident left, Zummo remarked, "For a Hasidic woman, she was very normal." See Shea Recording, Mar. 1 at 51:20.  Yagel did not condemn Zummo's remark and, instead, replied, "She's not from around here, that's why." <u>See</u> Shea Recording, Mar. 1 at 51:25.

On March 3, 2017, Yagel and Zummo discussed the work of an Orthodox Jewish builder in the Village. <u>See</u> Shea Recording, Mar. 3, Part 2 at 50:40.  Zummo told the Mayor that he suspected the builder was planning to add apartments in the basement of a home, but that he had not yet received the final plans. <u>See</u> Shea Recording, Mar. 3, Part 2 at 50:40-51:00.  Yagel asked plaintiff if the builder had submitted a check to the Village and she responded that he had not yet done so. <u>See</u> Shea Recording, Mar. 3, Part 2 at 51:00-51:02.  Yagel then told plaintiff and

13

Zummo: "Have him write a check.  Accept the plans.  Cash the check.  Then write him a letter and deny." See Shea Recording, Mar. 3, Part 2 at 51:03-51:10.  Yagel then remarked: "Can we get his license pulled? He's a slimy bag." See Shea Recording, Mar. 3, Part 2 at 53:05.  He then added that he thought the builder's "skin color doesn't look right." See Shea Recording, Mar. 3, Part 2 at 53:17.

Later the same day, Zummo and plaintiff discussed a vehicle fine received by a worker who drove to Ulster County to complete a job for a Jewish resident. See Shea Recording, Mar. 3, Part 1 at 1:31:30.  Zummo mimicked the speech of a Jewish man asking the worker to come to complete a job. See Shea Recording, Mar. 3, Part 1 at 1:31:55.

Still later that day, plaintiff, Zummo and Artha were in the office when a resident came to the counter to ask about the Village code as it relates to the parking of ambulances and police cars. See Shea Recording, Mar. 3, Part 2 at 1:14:50.  The resident complained that multiple police cars and ambulances from the Town of Ramapo were parked on her street. See Shea Recording, Mar. 3, Part 2 at 1:15:00-1:16:00.  Artha then told the resident, "You know what they use those ambulances for?  Chauffeurs." See Shea Recording, Mar. 3, Part 2 at 1:16:55.  Zummo added: "They use them to shuttle rabbis in.  They get away with it all the time." See Shea Recording, Mar. 3, Part 2 at 1:17:00.  He continued: "They use the lights and sirens.  The police won't stop an ambulance." See Shea Recording, Mar. 3, Part 2 at 1:17:30.  Thus, Zummo accused Jewish residents of the Village of breaking the law by using ambulances for their own religious purposes. See Id.

On March 31, 2017, plaintiff, Yagel and Zummo discussed an upcoming inspection for a Jewish resident. See Shea Recording, Mar. 31, Part 1 at 47:45.  Defendant Yagel said that he spoke with the resident previously and warned him to get his property inspected before starting

14

work on the plumbing system. <u>See</u> Shea Recording, Mar. 31, Part 1 at 48:05.   Zummo then mimicked the Jewish homeowner, stating, "In Brooklyn and in Ramapo this does not happen." <u>See Id.</u> Yagel did not address this mimicking behavior or discipline Zummo for his inappropriate conduct.

The same day, Yagel and Zummo discussed the removal of trees at an Orthodox Jewish home in the Village. <u>See</u> Shea Recording, Mar. 31, Part 1 at 10:00.   Zummo stated: "That's the way the Orthodox like it, 'I don't want to maintain anything. I don't want anything near my house. I want a nice big flat yard for my kids to play in.   So I'm going to clear anything that grows.'" <u>See</u> Shea Recording, Mar. 31, Part 1 at 10:12-10:22.   Yagel did not address this stereotyped statement from his staff member.

Later the same day, Yagel, plaintiff and Zummo discussed a home being built by an Orthodox Jewish builder. <u>See</u> Shea Recording, Mar. 31, Part 1 at 11:00.   Zummo told Yagel that the building plans for the property contain several different structures and proposed building close to the property line. <u>See</u> Shea Recording, Mar. 31, Part 1 at 12:10-12:40.   Yagel asked why the department was allowing the property to move forward and not denying the plans. <u>See</u> Shea Recording, Mar. 31, Part 1 at 12:44.   Plaintiff explained that the builder had already attended two TAC meetings to receive approval and only needed approval from the Planning Board. <u>See</u> Shea Recording, Mar. 31, Part 1 at 12:57.   Yagel then suggested that an attorney should attend the Planning Board meeting with the builder. <u>See</u> Shea Recording, Mar. 31, Part 1 at 12:55.   In discussing the plan for a wall around this property, Zummo stated that he told the builder, "This isn't Tel Aviv.   Cut it back." <u>See</u> Shea Recording, Mar. 31, Part 1 at 16:35.   Yagel did not address this statement and, instead, suggested that the builder should plant arborvitae trees to create his wall. <u>See</u> Shea Recording, Mar. 31, Part 1 at 17:04.

15

Plaintiff heard Yagel make derogatory comments about a number of Hasidic/Orthodox developers/landowners, including, but not limited to, Manes, Indig, Klein and Hirskowitz. See Shea Deposition at 195-216.  These stereotypic comments typically involved their purported desire to violate the law for the sake of making money. See Shea Affidavit ¶ 14.

Yagel and Zummo repeatedly directed plaintiff to slow down the processing of applications, responses to FOIL requests and any other services she was performing for Hasidic/Orthodox people. See Shea Id. ¶ 15.  Plaintiff often expressed her concern with these directions, making clear that she saw no reason to delay processing responses to requests or applications. See Id.

E. **Before she was terminated, plaintiff complained to other Village Trustees and the Village Attorney about the anti-Semitism she observed and experienced.**

In February 2017, plaintiff complained to the Village Attorney, Doris Ullman, about the whole antisemitic environment she experienced at work. See Shea Deposition at 149-150; 222, l.24 – 223, l.5.  She also informed Ms. Ullman about specific situations – "I told her it's very antisemitic the way he [Hirskowitz] is treated, the way they want me to delay his inspections . . ." Id. at 223.  And she told Ms. Ullman about the treatment accorded the Indigs, querying why a year had passed since issuance of their permit. See Id. at 224.

Plaintiff also spoke with Village Trustee Nick Wilson dozens of times about the work environment and, more specifically, about the Mayor authorization of discriminatory practices against Jewish residents and builders. See Id. at 226, 231.  Wilson responded in a wishy-washy way, advising plaintiff to "keep her head down, do her job, get her pay check." Id. at 232.  On one occasion, she reported to Trustee Wilson that Zummo told her that Yagel called her a "Jew lover." Id. at 227-228.  Wilson was "not shocked." Id. at 228.

16

Plaintiff also told Planning Board member Jerry Fox, who was helping her buy a condo, that her job was not secure and that the Mayor had called her a "Jew lover." Id. at 225-26.  As a result, Fox stopped looking at properties for her. Id. at 230.

### F.  Plaintiff's "expected" termination.

Plaintiff was terminated on June 23, 2017, immediately after she gave Mr. Hirskowitz a Certificate of Occupancy while Yagel was angrily pacing around the office. Id. at 110-11.

Plaintiff was not surprised by her termination; indeed, she expected it. See Id. at 113. Zummo had told her that the Mayor was looking to get rid of her because she was the "Jew lover." Id. at 114.  Zummo repeated this 3 or 4 times during the last several months of plaintiff's employment. Id. at 115.  He explained to her that Yagel called her this name because she helped Jewish residents and was courteous to them. Id. at 116.  Plaintiff related the Mayor's reaction to her interaction with a Jewish man, Avrohom Manes, who brought his beautiful little baby to the office. Id. at 124.  Shea kibitzed with Manes in a pleasant manner. Id. at 124.  The Mayor was not present, but later told her that she should not have had such friendly conversation and should have just asked if she could help Manes. Id. at 124.

Zummo further explained to plaintiff that Yagel wanted to bring to Pomona his assistant from Airmont, Betty. Id. at 115.  He explained that Betty hid him in the back of the office and did not have him answer calls from Jews or see them. Id.  On another occasion, before her termination, a woman came to the counter and indicated she had a job interview with the Mayor. Id. at 117.  Plaintiff asked for what position and Artha did not answer her, simply directing her to ask the Mayor. Id.  Zummo told plaintiff to start looking for another job. Id.

### G.  Pretextual bases for adverse action.

In terminating plaintiff, Yagel provided her no reasons, and when she asked for one, he simply stated that he was terminating her because he was the Mayor. Plaintiff received no memoranda or counseling regarding her job performance and defendants have provided none. Defendants now allege that Yagel fired plaintiff for performance lapses and cite several examples of events which either did not happen, are distorted or were quite remote in time from plaintiff's termination.

### 1. Death certificate issue.

Plaintiff received no training regarding death certificates until after Artha returned from her vacation in July 2016. See Shea Deposition at 74.  Before then, Artha did each one and the village paid her "a little cash on the side" for doing them. Id.  Before Artha left for vacation in early July 2016, plaintiff asked her what to do if someone died when she was away. Id. at 76. Artha responded that nobody will die. Id.  Two people did die while Artha was away. Id. Plaintiff contacted knowledgeable persons and completed the death certificates, but her cover letter included the wrong date, June instead of July. Id. at 76-77.

When Artha returned from vacation, she complained that plaintiff had not sent the certificate registered mail, though plaintiff knew of no such requirement. Id. at 77.

### 2. Responses to FOIL/FOIA requests.

Often, people seeking to buy property in Pomona would fill out a FOIL request and ask for a survey of the property or the property file. Id. at 62.  Plaintiff would get the survey and make a copy, collecting 25 cents. Id. at 62.  She would not respond to complex FOIL requests without getting approval from Artha, the Mayor or Village Attorney Ullman. Id. 63, 66.  She explained that Orthodox Jews would come to the counter, ask for a property survey through a

18

FOIL; she would say "sure" and process the FOIL as they waited. Id. at 118.   The process of responding took less than two minutes. Id. at 118-19.

Zummo told plaintiff that Artha would report these interactions to the Mayor. Id. at 119. He told plaintiff she could make the requester wait five days. Id.   She responded, "Why should I make them wait?" Id.   This occurred on a daily basis. Id.

### 3.   Plaintiff di not roll out any app relating to garbage pick-up times.

Pomona asserts as undisputed statement of material fact 15: "Plaintiff rolled out a defective app without authority while working for the village. Exhibit "D" page 145 lines 8-25." In fact, in July 2016, while Artha was on vacation, an employee of the Rockland County Solid Waste Authority contacted plaintiff and advised that this agency wished to provide village residents with virtual access to information concerning their garbage pick-up.   The Authority then rolled out an application which allowed village residents access to this information. Learning of this, defendant Yagel claimed that the information on the application was "garbage" and directed Artha to contact the Authority and give it the correct information on garbage pick-up times.   He wrote, "They missed the boat on this one.   The fact that they rolled this out without us being able to verify the information is extremely problematic.   I will be in contact with the County Executive on this matter." See Shea Affidavit, ¶ 3 and Exhibit 1 to Shea Affidavit.  Shea was not responsible for this roll out in any way. See Id.

### 4.   Zummo did not complaint about plaintiff's scheduling of inspections.

Pomona further assets that "Louis Zummo complained about Plaintiff's job performance to Mayor Yagel Exhibit "D" page 211 lines 6-16."   In fact, Yagel could recall no request by

Zummo that he terminate plaintiff's employment. <u>See</u> Yagel Deposition at 210, ll. 14-24.  Yagel testified that, in June or July 2016, Zummo told him that plaintiff was scheduling appointments for him, a part-time Building Inspector, when he was not at work, not knowing how long he would require to complete an inspection. See <u>Id.</u> at 211, l.25 – 212, l.25.  He claims that, after receiving this complaint from Zummo, he spoke with plaintiff  and told her that she needed to speak with Zummo before making appointments for him. <u>Id.</u> at 213, ll. 8-22.  Plaintiff responded that when she made these appointments, Zummo was not present and had not responded to her effort to get his advice on scheduling. <u>Id.</u> at 214, ll. 4-8.  She explained further that the residents needed to get inspections completed.

After this conversation, which he believes occurred in 2016, Yagel could not recall further discussion with Zummo about this issue. <u>Id.</u> at 217.  In his deposition, Zummo stated that, shortly after plaintiff commenced, he told her how much time he would need to do various kinds of inspections.  She was in charge of scheduling his appointments with building owners and contractors and claims that he directed her to set up appointments as soon as possible because he knew the inspections were require before they could proceed.  He did not complain to the Mayor about how plaintiff handled his scheduling.  He claims to have frequently complained to the Mayor about entries Shea made in the computer relating to the substance of permits issued by the Village, a matter the Mayor does not reference in relating his conversations with Zummo regarding Shea.

### 5.   Artha did not inform Yagel of alleged issues with plaintiff.

Pomona next claims that the Village Clerk had certain issues with plaintiff's job performance, but by her own admission, she did not share these with Yagel.

In paragraph 20 of its statement of material undisputed facts, Pomona states: "Fran Arsa Artha gave a list of things Plaintiff did wrong on the job to Mayor Yagel. Exhibit "D" page 218 lines 3-9." But this statement is untrue. Yagel testified that Artha gave him a list of instructions that she had previously created for and given to plaintiff for the time that she would be out on vacation. See Yagel Deposition at 217 l.21 – 218, l.5. Additionally, whether Artha gave plaintiff this list of instructions before or after her vacation is disputed. See Shea Deposition at 142, ll.6-7; 144 ll.4-10). And this list had nothing to do with "things plaintiff did wrong on the job," as Pomona contends. Id.

In paragraph 23 of its statement of material and undisputed facts, Pomona further claims that Artha admonished plaintiff for her job performance, citing to page 72 lines 7-10 of her deposition. There, Artha discussed a single incident – she claims that plaintiff wrote and signed a letter containing errors and signed her [Artha's] name. This occurred in January 2017. She conversed with plaintiff alone about this and never discussed the matter with the Mayor. See Artha Deposition at 73, l.24 – 74, l.8. On another occasion, Artha claims that plaintiff was misinformed as to whether a motor vehicle fatality occurred within the jurisdiction of the Village. She told plaintiff that the person did not die in the Village. She did not know when this event occurred or when she spoke with plaintiff about it. The Mayor was not present and Artha could not recall speaking with him about the matter. See Artha Deposition at 75-77.

In paragraph 24 of its statement of undisputed facts, Pomona cites Artha's testimony to the effect that plaintiff got angry when being told to follow protocol, citing Exhibit "E" Pages 129 lines 2-25 through Page 130 lines 2-8. The cited reference is to an incident that allegedly occurred about one year before plaintiff was terminated and before Artha went on her two week vacation in July 2016. See Artha Deposition at 127. Artha claims she told plaintiff that a specific

21

check had to be signed by either the Mayor or Deputy Mayor.  She placed the check in the deputy mayor's mailbox and plaintiff wanted the check to remain on her own desk.  Artha expressed concern that, if left on plaintiff's desk, the check might get lost.  She claims it was then Village protocol to keep the unsigned check in the mailbox. Artha claims that Shea became very angry and mocking and dismissed this protocol.  Artha told Shea that she was acting like an asshole.  Artha denied reporting this incident to the Mayor. <u>See</u> Artha Deposition at 127-130. Plaintiff denied that this incident ever happened, <u>see</u> Shea Affidavit ¶ 5, and states that, upon returning from her vacation, Artha apologized to plaintiff for *her own* unprofessional behavior before she had left. <u>Id.</u>

Finally, Pomona claims in paragraph 25 of its statement of undisputed facts that plaintiff had an anger management issue, again citing Artha's deposition testimony.  But Plaintiff had no such issue, and this was never discussed with her by anyone. <u>See</u> Shea Affidavit ¶ 6.

### H.  NYSDHIR finds probable cause of religious discrimination by the Village against plaintiff.

The New York State Division of Human Rights found probable cause that defendant Village discriminated against plaintiff on the basis of her advocacy for Jews. <u>See</u> Sussman Affirmation, Exhibit 1.

### I.  Defendants' treatment of plaintiff was part of a broader pattern of their adjudicated anti-Semitism.

The anti-semitism these defendants exhibited is part of a much broader pattern of resistance by Yagel and other leaders of the Village to the movement of Orthodox/Hasidic people into "their" community.  This hostility has been the subject of judicial adjudication.  The Village of Pomona and defendant Yagel were named defendants in <u>Congregation Rabbinical Coll. of Tartikov v. Village of Pomona</u>, No. 07-cv-6304 (KMK).  In his decision finding the

22

defendant Village liable for religious discrimination, Judge Karas found that the Village Board had enacted amendments to its zoning code with the substantial purpose to discriminate against the movement of Hasidic/Orthodox Jews into the Village. See Congregation Rabbinical Coll. of Tartikov v. Village of Pomona, 280 F.Supp.3d 426 (S.D.N.Y. 2017), attached to Sussman Affirmation as Exhibit 2.

After a ten day bench trial, in which Yagel was represented in his official and individual capacities, Judge Karas found as follows:

> Before the Board voted on the proposed wetlands law, Village residents began campaigning to become or remain members of the Board. Sanderson, Yagel, and Louie ran together on a slate in the March 2007 Village election . . . . A major piece of their platform was opposition to Tartikov's development of the Subject Property. One campaign flier stated:
>
>> This year it is imperative that all village residents vote for leadership that have an unwavering long-term commitment to the Village.
>>
>> We are, according to the lawyers for the Rabbinical College of Tartikoff who have purchased land on Route 306 in the village, going to be faced with a proposal for a huge development that will include housing for thousands of adult students and their families. Their lawyers have not been shy to point out that they will use every legal avenue to pursue their plans, including the federal statute RLUIPA.
>>
>> From what we know of the plan as it has been leaked to the public, it will have real environmental and safety problems; compelling interests that will allow the village to fight this plan, if and when presented to the Village Board.
>>
>> You need to vote for a team that is prepared to stand up to this threat of using the fundamentally unfair RLUIPA statute as a hammer against our village. A team that is in it for the long term, and one that has

23

already prepared themselves with a strategy to fight
for Pomona.

This same flier states that "[t]he single most important issue facing
the Village is clearly the Tartikoff development." Sanderson,
Yagel, and Louie vowed to "vigorously defend [the Village's] land
use codes and regulations." A second flier reiterated these same
concerns and made the same promises. (See Pls.' Ex. 42, at 2.) In a
campaign video, Sanderson stated that Tartikov "could completely
change the village and the make-up of the village." Shortly before
the election, Yagel and Louie drafted a submission for The Journal
News editorial page . . . stating their opposition to Tartikov's
proposal and noting that "a virtual mini-city within the village[]
that will house thousands of homogenous individuals" was not a
"'natural' progression" for the Village. Yagel was also quoted in
the *New York Times* describing Plaintiff's plans for the Subject
Property as "disgusting." Sanderson, Yagel, and Louie won the
March 2007 election.

See Id. at 443-44 (citations omitted).

A short time after his election to office, Yagel voted to adopt the 2007 Wetland Law. AS

Judge Karas found: "The Wetlands Law restricts Tartikov's use of the Subject Property because

the location of the driveway onto the property falls within the 100-foot buffer mandated by that

law. An access road cannot be built in any other location because of the presence of wetlands

and steep slopes, which would require significant regrading." Id. at 445.

Judge Karas made additional findings of fact related to Mr. Yagel and the Village:

The Wetlands Law, the relevant provisions of which were adopted
in April 2007 (Local Law No. 5 of 2007), was enacted despite the
fact that there is no evidence that the Village conducted any studies
prior to the adoption of the law to determine where the Village's
wetlands were, what threats they faced, or how best to protect
them. Village officials did, however, know there were wetlands
located on the Subject Property before the law was adopted, (see
Trial Tr. 670 (Marshall stating that he knew there were wetlands
on the Subject Property prior to 2007); Pls.' Ex. 69, at 1 (email
from Yagel discussing the presence of wetlands on the Subject
Property); Pls.' Ex. 104, at 1 (Marshall noting, in January 2002,
that there are wetlands on the Subject Property); Pls.' Ex. 107, at 2

24

> (October 22, 2001 Board meeting minutes noting that Marshall "stressed" that YSV needed to protect the wetlands located on the Subject Property); Pls.' Ex. 141, at 20 (1997 Update to the Village's Master Plan noting that the Subject Property contains "part of a large State-regulated wetland")), indicating that this law was designed to prevent Tartikov from building its proposed rabbinical college.

Id. at 451.  The district court also noted:

> Further evidence that the Village passed the Wetlands Law to target Tartikov is found in the scope of the law's provisions. The law exempts from its coverage residences improved with single family residences. See Village Code § 126-3(D) ("The aforesaid [100] foot buffer in which regulated activities are not permitted to take place shall not apply to lots that are improved with single-family residences.")  In the Village, there are 1,156 parcels of land, with 285 of them located within 100 feet of mapped wetlands.  Of those 285 parcels, 240 of them are improved with single family residences, leaving a maximum of 45 parcels subject to regulation. The fact that the Subject Property just so happens to be one of the 45 parcels subject to regulation is telling.  Also troubling is the Village's decision to adopt a law relating to wetlands in 2007, after it learned of Tartikov's proposed use, despite the fact that it considered passing a similar law in the 1990s.  It was not until Tartikov came along that such a law became "necessary" to prevent the unidentified risks to the Village's unidentified wetlands.

Id. at 451-52 (some citations omitted).

Judge Karas found more than circumstantial evidence that the Village engaged in intentional religious discrimination in 2007, when it enacted the wetlands law, writing:

> The Court need not rely solely on this circumstantial evidence to conclude that the Wetlands Law was conceived of and passed with a discriminatory purpose. Village officials explicitly stated their intent to thwart Tartikov's plans.  Between the time the Wetlands Law was first proposed and the time that it was adopted, Sanderson, Louie, and Yagel indicated in campaign materials that voters needed to "stand up to the threat" that Tartikov posed, further stating "[y]ou need to vote for a team that is prepared to stand up to this threat of using the fundamentally unfair RLUIPA statute as a hammer against our village."  Sanderson also

25

specifically indicated in a campaign video that the rabbinical college "could completely change the village and the *make-up* of the village." (Pls.' Ex. 47, at 1 (emphasis added).) The campaign materials for all three candidates indicated that "the single most important issue facing the village [was] clearly the Tartiko[v] development."  Sanderson, Louie, and Yagel won the election in March 2007,  and, at least, Yagel and Louie voted in favor of passing the Wetlands Law.

Id. at 452 (some citations omitted).  The judge noted further:

In addition to these comments, Plaintiffs have identified a number of other statements by Village officials indicative of Defendants' prejudice against Tartikov and Orthodox/Hasidic Jews, see Yeshiva Chofetz Chaim Radin, Inc. v. Village of New Hempstead, 98 F. Supp. 2d 347, 355 (S.D.N.Y. 2000) (holding that "discriminatory comments by the [m]ayor . . . present grounds for allowing a jury to judge the credibility, and motivation, of the [m]ayor . . . as well as the motivation that can be attributed to the [v]illage itself in passing the disputed provisions"), including:

> • In February 2007, Yagel and Louie authored a letter to *The Journal News* stating that "a virtual mini-city within the village . . . that will house thousands of homogenous individuals" was not a "natural" progression for the Village.  Yagel was also quoted in the *New York Times* stating that it was "disgusting" that Tartikov was "trying to create [a] mini city in our village."

> • Sanderson has publicly stated that the Village should "maintain[] its cultural and religious diversity."  However, Sanderson is unaware whether any Hasidic Jews live in the Village.

> • Leslie Sanderson, who served as Village Clerk, testified that she was worried Tartikov would "usurp" the Village and Board of Trustees.

> • Louie made a Facebook post which indicated discriminatory animus towards the Orthodox/Hasidic Jewish population.

Id. at 452-53 (some citations omitted).

26

As in the instant case, where Yagel has made efforts to disguise his discriminatory intent through the use of various code words, Judge Karas noted, "Significantly, these statements were made despite Defendants' efforts to refrain from publicly making disparaging or discriminatory comments. (See Pls.' Ex. 13, at 1 (email from Yagel to Louie and Sanderson noting that they "[m]ust be very careful about what we say" because they "[d]on't know who is in the audience"); Pls.' Ex. 146 ¶¶ 110–11 (admitting that Louie and Yagel told "everyone" at a Pomona Civic Association meeting that they "must be careful about their statements").)" Id. at 453.

In footnote 19, commenting on the newspaper quotations cited above of Yagel, the district court wrote, "Defendants take solace in the fact that these statements were admitted as exhibits, but not for the truth of the matters asserted.  However, these statements were offered, and admitted, not for their truth, but because they reveal Yagel's and Louie's animus toward Tartikov and Orthodox/Hasidic Jews." See Id. at 452 n. 19.

Nor was the Village of Pomona's conduct in showing hostility toward Orthodox Jews demonstrated only by and through the Tartikov matter.  Judge Karas made the following findings of fact concerning the Village:

> Defendants' behavior with respect to other proposed projects is indicative of their intent to thwart the expansion of the Orthodox/Hasidic community.  The Village has a demonstrated history of opposing various Orthodox/Hasidic Jewish land uses near the Village.  As early as 1996, the Village opposed the expansion of Bais Yaakov, an Orthodox Hasidic yeshiva in Ramapo.  The Village wrote a letter in opposition to the expansion, attended a Ramapo meeting and read an opposition statement, challenged the expansion in court, and encouraged Village residents to object to the expansion. (See id. at 7–8; see also Trial Tr. 808 (Ulman affirming that the Village encouraged opposition to the expansion of Bais Yaakov).)  In 1999, the Village did not object to the "Anna Mann" property becoming an assisted living facility, but then when it was later proposed that the property be used for a yeshiva, the Village did oppose the development.  In

27

2004, as noted above, the Village opposed Ramapo's Comprehensive Plan and the ASHL. The Village also expressed opposition to the development of three yeshivot outside of the Village.

The Village does not, however, have this same history of opposition when it comes to non-Orthodox/Hasidic land uses. In 2001, Marshall informed residents that they had to accept group homes within the Village because such land uses were protected under the FHA. [The Village did not provide similar instructions with regard to RLUIPA. Instead, it passed a resolution in February 2007 asking Congress to revisit the law]. In May 2002, the Board, with the exception of one Trustee, informally approved Barr Laboratories' purchase of land within the Village to erect an office building, even though the land was zoned residential. Furthermore, on the same day it adopted Local Law No. 1 of 2007, the Board voted in favor of applying for funds to create a senior citizen center within the Village.

Id. at 454-55 and n. 21 (citations omitted) (Footnote 21 embedded in text in brackets).

And, before Judge Karas, Village Attorney Ulman "testified that the Village has 'consistently opposed high-intensity development,' as a means of showing that the Village opposes large developments regardless of who proposes them, but the fact remains that the Village has consistently opposed proposals by Orthodox/Hasidic Jews." Id. at 455. Judge Karas rejected this testimony as pretextual, masking discriminatory intent.

Judge Karas also made findings of fact that Yagel gave false testimony in attempting to claim a non-discriminatory purpose for the wetland amendment he favored:

Defendants also cite to the testimony of Sanderson, Yagel, and Louie to argue that the Wetlands Law was not meant to discriminate against Tartikov. Sanderson testified that the law was not passed with the intention of keeping Tartikov out of the Village. The Court does not credit this testimony because Sanderson ran for mayor on a platform that included a promise to fight to keep Tartikov from developing the Subject Property and expressed concerns about the "make-up" of the Village changing if Tartikov were to build on the property. Yagel similarly testified that the Wetlands Law was not adopted to prevent Tartikov from

28

building a rabbinical college, and also that he was unaware of the existence of wetlands on the property. The Court does not credit this testimony, and in one respect, it is false. The Court does not credit Yagel's testimony that the law was not adopted to discriminate against Tartikov because Yagel made discriminatory comments leading up to the adoption of the law. For example, in early 2007, Yagel co-authored a letter to *The Journal News* stating that "a virtual mini-city within the village . . . that will house thousands of homogenous individuals" was not a "natural" progression for the Village, and was quoted in the *New York Times* saying that it was "disgusting" that Tartikov was "trying to create this minicity in our village." The Court does not credit the remainder of Yagel's testimony because it is demonstrably false. As indicated in the preceding paragraph, Yagel discussed the existence of wetlands on the Subject Property in January 2007.

Id. at 465 (record citations omitted).

In affirming in part Judge Karas' decision, the Court of Appeals for the Second Circuit stated as follows: "Yagel ran in 2007 village elections as part of a slate  with two other candidates who campaign on a promise to stand up to the threat posed by a Jewish religious corporation, TRC, a rabbinical college, which proposed to build a Torah community designed to isolate students from distractions and surround them with others engaged in the same study. The slate called RLUIPA 'fundamentally unfair' and its deployment against the Village of Pomona 'a hammer against our village.' See Sussman Affirmation, Exhibit 3 at 50.

## STANDARD OF REVIEW

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d

29

Cir. 2011) (quotation marks omitted); see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).

"It is the movant's burden to show that no genuine factual dispute exists." Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see also Berry v. Marchinkowski, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non-movant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . ., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" Wrobel v. County of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," Guardian Life Ins. Co. v. Gilmore, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Brod, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 495 (2d Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986) (quotation marks omitted)). However, a district court should consider only evidence that would be admissible at trial. See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" DiStiso, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); Vital v. Interfaith Med. Ctr., 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted).). Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010); see also Kassel v. City of Middletown, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role

of the [c]ourt at summary judgment to resolve [a] factual clash"); Balc v. Nastasi, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." Scott v. Coughlin, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact."). See Rose v. Garritt, No. 16-cv-03624, 2020 U.S. Dist. LEXIS 12806, at *16 (S.D.N.Y. Jan. 23, 2020) (slip opinion at 10-12)

In addition, a district court is not to accept the factual assertions of those moving for summary judgment where a jury could reject their version of events. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 151 (2000) ("[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe"). As such, "the court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id.

## ARGUMENT

### Point I

### Plaintiff has made out a prima facie case of discrimination.

Plaintiff claims that, acting through Yagel, defendants terminated her employment because she attempted to service Orthodox/Hasidic residents and the Mayor viewed her as a "Jew lover." Plaintiff is not Jewish, but she makes out a *prima facie* case of discrimination because she was subject to an adverse employment action due to the Mayor's conclusion that she

32

was "Jew Lover" willing to efficiently serve Orthodox-Hasidic Jews and non-compliant with his direction that she burden members of that group with delays and obstruction as she performed her official tasks.

## Point II

### A reasonable jury could conclude that defendants' asserted bases for terminating plaintiff are pretextual.

As is discussed above, the Mayor did not provide plaintiff any reason for her termination. For several months before her termination, Zummo, her most direct supervisor, advised plaintiff that the Mayor was calling her a "Jew lover" and suggested she start looking for another job. When plaintiff sought to understand why she was being terminated, Yagel provided no explanation, only an assertion of his authority as Mayor.

Defendants now adduce a variety of bases for her termination, but a reasonable jury could find each pretextual. Plaintiff misdated a letter concerning death certificates, but properly and timely prepared the certificates themselves. She received no training on this and was not instructed that she needed to mail them in a certain manner. Plaintiff properly scheduled Zummo's inspections, though the Mayor interfered with these, seeking to delay or cancel them as part of his effort to delay approvals for Orthodox/Hasidic Jews. Plaintiff did not engage in a screaming match with the Mayor as Zummo claims. Plaintiff did not have an anger management problem and was never counseled concerning any such issue. Nor did Artha advise the Mayor of circumstances now posed as justifying his adverse action. In short, a reasonable jury could easily reject each of these reasons and conclude that each was either false, insignificant or not known to the decision maker, Yagel.

## Point III

### A reasonable jury could conclude that plaintiff was discriminated against as she alleges.

Plaintiff has set forth more than sufficient direct evidence to demonstrate that defendant Yagel's religiously-based animus and nothing else informed her termination.  Her direct supervisor, Zummo, repeatedly warned her that the Mayor regarded her as "Jew lover," predicted her termination and suggested she seek other employment.  Months before her termination, plaintiff advised both the Village Attorney and Village Trustee Nick Wilson of the animus Yagel displayed.  Neither took any action to curb Yagel or to protect her employment.

As Yagel acted on behalf of the Village, and as his intent may fairly be attributed to it, both defendants are liable for his discriminatory conduct.

## Point IV

### Yagel's conduct violates the Equal Protection Clause.

Yagel terminated plaintiff because she served Jewish residents in a manner consistent with the standards established for her position and refused to discriminate against them on the basis of their religion.  Yagel claims that such discrimination does not violate the equal protection clause.  He is wrong.

To prove an equal protection violation, plaintiff must prove purposeful discrimination by a government actor, directed at a suspect class, such as a religion. See Pyke v. Cuomo, 567 F.3d 74, 78 (2d Cir. 2009).  Here, plaintiff alleges that Yagel terminated her as a means of forwarding his discriminatory treatment of Orthodox/Hasidic Jews.  His behavior, she alleges, was intentional and directed at a suspect class, members of a religious group based upon their religion.

34

"Discriminatory purpose implies that the decision-maker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." Hayden v. County of Nassau, 180 F.3d 42, 50 (2d Cir. 1999).   A desire to discriminate must be "a significant reason" for the challenged action." Cine SK8 Inc. v. Town of Henrietta, 507 F.3d 778, 786 (2d Cir. 2007).   Here, Yagel terminated plaintiff because she was sympathetic to the group whose mobility into Pomona he wished to delay and burden. His action against her was borne from his belief that she was a "Jew lover" and his observation of the way she treated members of the Jewish religion.

In support of his motion, Yagel misstates the record, claiming that Yagel instructed plaintiff to schedule building permit inspections and FOIL requests "in accordance with the law." This is false: Yagel intervened in such matters to delay the provision of government services to Orthodox/Hasidic Jews on the basis of their religion.   His pernicious motivation was plainly stated in scores of interactions plaintiff witnessed, some of which she recorded.   These allegations are hardly conclusory; quite the opposite.   Shea's termination was part of a broader, albeit failing, pattern of behavior in which Yagel engaged for more than a decade, aimed at restricting and burdening Orthodox/Hasidic residency in the Village.   His comment about pork rinds was not a stray remark, but part of a culture of mocking and deprecating Jews, shockingly repeated stereotypic attributions by him and/or his collaborator and subordinate Louis Zummo. If similar comments were made and repeated on a daily basis by municipal officials about African Americans or Latinos or women, great outrage would appropriately follow.

Despite the clearly established law that prohibits state actors to choose a course of conduct which is premised on invidious discrimination, Yagel claims that Shea's complaint asserts no cognizable right against him.  However, "a plaintiff can assert a claim under Section

35

1983 if some law other than Title VII is the source of the right alleged to have been denied."
Saulpaugh v. Monroe Com'y. Hosp., 4 F.3d 134 (2d Cir. 1993); See also Carrero v N.Y. City
Housing Authority, 890 F.2d 569, 577 (2d Cir. 1989). And the cases Yagel cites recognize that a
public employer may predicate employment-based claims upon the Equal Protection clause. See
Gierlinger v. New York State Police, 15 F.3d 32, 34 (2d Cir. 1994) (right under 14th Amendment
to be free from sexual harassment). Of course, in establishing such claims, as here, plaintiff must
establish the personal involvement of the state actor she seeks to hold liable. Id.

Plaintiff does not assert "a selective enforcement claim," cf. Wilson v. New York, No.
15-cv-23 (CBA)(VMS), 2018 U.S. Dist. LEXIS 49609 (E.D.N.Y. Mar. 26, 2018); Savino v.
Town of Southeast, 983 F.Supp.2d 293, 299-300 (S.D.N.Y. 2013).[1]  Instead, she asserts that
Yagel acted against her out of an express discriminatory intent, because he believed she was a
"Jew lover" and did not wish a person who harbored such attitudes and fairly treated Jews
working for the Village.

In establishing her equal protection claim, plaintiff does not seek to compare herself to
any other employee; rather, she argues that the government acted invidiously against her in

---

[1] In Savino, plaintiff claimed an equal protection violation because a local building inspector discriminated against
him on the basis of his national origin. Judge Karas denied dismissal of the case, which defendants claimed raised
only a selective enforcement claim without sufficient comparators. As Judge Roman recounted in denying
defendants' motion for summary judgment, "Specifically, whereas Defendants argued that the complaint attempted
to present exclusively a selective enforcement equal protection claim—because, purportedly, cases involving the
enforcement of zoning violations all require plaintiffs to show similarly situated properties—Judge Karas held that
the amended complaint stated a claim both for selective enforcement of the zoning laws compared to similarly
situated property owners and for the discriminatory application of facially neutral laws based on direct evidence
under Pyke v. Cuomo, 258 F.3d 107 (2d Cir.2001). For this second theory, Judge Karas stated, "a plaintiff who
alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner
need not show a better-treated similarly situated group of individuals of a different race," and "plaintiffs only have
to show that racial animus or animus based on national origin is only a part of the reason why these [informations]
were issued." See 983 F.Supp.2d at 299-300. Judge Roman denied summary judgment as to both claims. See Id. at
301-09.

pursuit of a discriminatory design and purpose the aim of which was to burden and frustrate Orthodox/Hasidic Jews. Cf. Gentile v. Nulty, 769 F.Supp.2d 573, 580-82 (S.D.N.Y. 2011) (finding no comparator treated more favorably and consequent incapacity to establish selective enforcement claim).

Comparator evidence is relevant to establish an invidious purpose necessary to satisfy the elements of an equal protection case absent direct evidence of discriminatory motive.  Here, direct evidence of discrimination on an impermissible basis exists: had plaintiff not been a "Jew lover," a reasonable jury could find that Yagel never would have terminated her.  As the court noted in Savino, having adduced direct evidence of discriminatory intent:

> [A] plaintiff need not prove "that a government decision-maker was motivated solely, primarily, or even predominantly by" his or her race or national origin. United States v. City of Yonkers, 96 F.3d 600, 611 (2d Cir.1996).  Once a plaintiff shows that a decision was so motivated "at least in part," a defendant must show that the same result would have been reached even without the impermissible consideration. Id. at 612 (internal quotation marks and citations omitted); accord Doe v. Village of Mamaroneck, 462 F.Supp.2d 520, 546 (S.D.N.Y.2006).  "If the defendant comes forward with no such proof or if the trier of fact is unpersuaded that [consideration of the plaintiff's class membership] did not contribute to the outcome of the decision, the equal protection claim is established." City of Yonkers, 96 F.3d at 612 (internal quotation marks and citation omitted).

983 F.Supp.2d at 302-03

Nor does Engquist v. Oregon Dep't of Ag., 553 U.S. 591, 128 S. Ct. 2146 (2008) control or preclude plaintiff's claim.  The issue there was whether a person who did *not* claim that an invidious ground protected by the Fourteenth Amendment informed her termination could sustain an Equal Protection claim by showing that the adverse action was simply arbitrary and vindictive.  As Chief Justice Roberts' majority opinion begins, "The question in this case is

37

whether a public employee can state a claim under the Equal Protection Clause by alleging that she was arbitrarily treated differently from other similarly situated employees, *with no assertion that the different treatment was based on the employee's membership in any particular class.*" Id. at 2148 (emphasis added).

Engquist did not insulate state actors from Equal Protection claims premised upon claims that a state actor discriminated against an employee on the basis of race, religion or gender, the nature of the claim here asserted.   Nothing about the latitude recognized as granted to government "as employer" in Engquist suggests any tolerance for the blatant and outrageous religiously-based discrimination plaintiff suffered here.   This type of employment practice relates to the "basic concern of the Equal Protection Clause . . . with state legislation whose purpose of effect is to create discrete and objectively identifiable classes." San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 60, 93 S.Ct. 1278 (1973) (Stewart J. concurring) (cited approvingly in Engquist at 2152).

Plaintiff does not claim that Yagel made an "individualized, subjective personnel decision in a seemingly arbitrary or irrational manner," Engquist at 2155, but rather that he did so for discriminatory reasons outlawed by the core of the Equal Protection clause.   And, as if to emphasize the distinction, the majority decision in Enquist reiterates decades of settled law, "State employers cannot, of course, take personnel actions that would independently violate the Constitution." Id. at 2156.

Contrary to defendant Yagel's briefing, plaintiff also does not assert a First Amendment claim, predicated on her protected speech acts or her associations.   Cf. African Trade & Info Ctr. Inc. v. Abromaitis, 294 F.3d 355, 363 (2d Cir. 2002) (holding that plaintiff's Equal Protection

claim was inextricably linked to First Amendment claim because they asserted they were denied equal protection to punish them for their speech).

## Point V

### Yagel cannot claim qualified immunity.

Recognizing this lawsuit is against him in his individual capacity, Yagel seeks to invoke qualified immunity. See Brandon v. Holt, 469 U.S. 464, 471-73 (1985) (holding that, where an official is sued only in his "official capacity," qualified immunity does not apply to him/her). But, contrary to defendant Yagel's claim, Engquist, decided in 2008, reiterated the long-established doctrine that a public employer cannot discriminate in employment in a manner which offends the Fourteenth Amendment by making decisions based on invidious classifications.

Accordingly, if a reasonable jury determines that Yagel fired Shea because he was upset that she treated Orthodox/Hasidic Jews fairly and was "a Jew lover," Yagel  violated the Fourteenth Amendment's prohibition against religiously-based discrimination, and this was plainly clearly established in June 2017.  That Shea herself is not Jewish is besides the point: what matters is that the adverse employment action which affected her was premised on impermissible religious discrimination, which the law defines as something quite different from the kind of "arbitrary" or "irrational" basis Engquist held was beyond the reach of the Fourteenth Amendment precisely because it was *not based* on such prohibited classifications.  Accordingly, Yagel's qualified immunity argument should be rejected

<u>Point VI</u>

**Punitive damages are available against Yagel.**

Contradicting his prior claim to qualified immunity because he is being sued as an individual and violated no clearly established right, Yagel next argues that he cannot be sued for punitive damages because he is sued in and only in his official capacity.  However, in <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247 (1981), while barring the grant of punitive damages against cities and counties, the Court held that juries could grant such damages individual defendants in 1983 lawsuits: "If a government official acts knowingly and maliciously to deprive others of their civil rights, he may become the appropriate object of the community's vindictive sentiments. <u>See</u> <u>generally</u> <u>Silver v. Cormier</u>, 529 F.2d 161, 163 (CA10 1976); <u>Bucher v. Krause</u>, 200 F.2d 576, 586-588 (CA7 1952), <u>cert.</u> <u>denied</u>, <u>345 U.S. 997</u>, <u>73</u> S.Ct. 1141, 97 L.Ed. 1404 (1953)." <u>Id.</u> at 267.  Indeed, such awards helped to justify the Court's holding that municipalities *themselves* could not be held liable for punitive damages:

> By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources, the statute directly advances the public's interest in preventing repeated constitutional deprivations. [footnote omitted].  In our view, this provides sufficient protection against the prospect that a public official may commit recurrent constitutional violations by reason of his office. The Court previously has found, with respect to such violations, that a damages remedy recoverable against individuals is more effective as a deterrent than the threat of damages against a government employer. <u>Carlson v. Green</u>, 446 U.S., at 21, <u>100</u> S.Ct., at 1473. We see no reason to depart from that conclusion here, especially since the imposition of additional penalties would most likely fall upon the citizen-taxpayer.

Id. at 269-70.  "A municipality, however, can have no malice independent of the malice of its officials. Damages awarded for *punitive* purposes, therefore, are not sensibly assessed against the governmental entity itself."  Id. at 267 (emphasis in original).

And, in <u>Smith v. Wade</u>, 461 U.S. 30 (1983), the Court approved a jury instruction that punitive damages may be based either on intentional wrongdoing by an individual defendant or on the defendant's reckless disregard for the plaintiff's constitutional rights.

Here, identified as a state actor, Yagel is sued in both his official *and* individual capacities, and nothing in the complaint suggests to the contrary.  In terminating plaintiff, he was acting as Mayor, but that does not affect his capacity to be held to account for punitive damages. Yagel is represented separately in this lawsuit precisely because he was sued both individually and officially.  His motion to disallow punitive damages for his blatant and wanton violation of plaintiff's constitutional rights should be denied.

<u>**Point VII**</u>

**Pomona's motion should likewise be denied.**

Pomona's motion proceeds on a version of the facts largely contradicted by plaintiff's admissible evidence and fails to confront the mountain of evidence made available during discovery to its counsel.  Likewise, Pomona would conceal its long history, recounted by Judge Karas, of exclusionary conduct toward Orthodox/Hasidic Jews. <u>See</u> <u>Tartikov</u>, <u>supra</u>.

In support of its summary judgment motion, Pomona argues that its Mayor had legitimate non-discriminatory reasons to terminate plaintiff when her term expired in April 2017.  The record establishes that he did not do so, however, and Shea continued working until June 23, 2017.  Indeed, the Village Board increased her salary in April 2017.  She was terminated on June

23, immediately after the Mayor saw her hand a Certificate of Occupancy to an Orthodox Jew against whom he had expressed antipathy on numerous prior occasions.

By the time of her termination, plaintiff had received no memorandum counseling her as to any work-related deficiency.  The Mayor offered no reason other than his authority when asked for a reason for this adverse action.  And, as is demonstrated above, each and every reason defendants advance for the termination is contested.  Several are remote in time from the termination.  The Mayor lacked knowledge of other incidents which defendants now claim he relied upon.  Accordingly, a reasonable jury could reject each and every reason as a pretext and find that the Mayor acted as he did out of blatant discriminatory animus based upon religion.

Second, Pomona argues that there is no admissible evidence of Yagel's discriminatory conduct or attitude.  This is sufficiently refuted above.  Suffice it to add that Zummo was one of plaintiff's supervisors and his testimony is admissible as admissions against his employer, the Village, and his supervisor, Yagel. See Fed. R. Evid. 801(d)(2)(D).  Zummo was plainly Pomona's employee and agent and his statements to plaintiff were made within the scope of their employment relationship, indeed, in explanation of the Mayor's treatment of her and his likely termination of her based on her being a "Jew lover."

Burlington Coat Factory Warehouse Corp. v. Espirit de Corp., 769 F.2d 919, 924 (2d Cir. 1985) is not to the contrary.  There, a non-movant sought unsuccessfully to rely on out of court statements made *by its own employees* to defeat summary judgment, and the Second Circuit affirmed rejection of such testimony

> Burlington also relies on the uncorroborated hearsay testimony of its own personnel.  They stated that other suppliers had informed them that Federated was applying pressure not to sell to Burlington.  This testimony hardly outweighs the lack of any evidence of similar pressure on Esprit, a not insignificant omission

42

in an action which alleges that Federated conspired with Esprit.  In any event, we need not consider such evidence because Burlington cannot rely on inadmissible hearsay in opposing a motion for summary judgment, see Oreck Corp. v. Whirlpool Corp., 639 F.2d 75, 80-81 (2d Cir. 1980); Filco v. Amana Refrigerator, Inc., 709 F.2d 1257, 1267 (9th Cir. 1983); Contemporary Mission, Inc. v. U.S. Postal Service, 648 F.2d 97, 105 n. 11 (2d Cir. 1981); Price v. Worldvision Enterprises, Inc., 455 F. Supp. 252, 266 n. 25 (S.D.N.Y. 1978); Lyon Ford, Inc. v. Ford Motor Co., 342 F. Supp. 1339, 1343 (S.D.N.Y. 1971), absent a showing that admissible evidence will be available at trial. Burlington has made no such showing.

Id. at 924.  This reasoning does not apply here, and Fed. R. Evid. 801(d)(2)(D) did not apply in that instance.

## CONCLUSION

Contrary to defendants' dismissive arguments, plaintiff has provided sufficient evidence which, if believed, establishes both of her substantive claims and her entitlement to compensatory and punitive damages.  Defendants motions should be denied.

Dated: Goshen, New York
      June 10, 2020

                Respectfully submitted,
                SUSSMAN & ASSOCIATES
                *Attorneys for Plaintiff*

                By: _____
                   Michael H. Sussman (3497)
                   1 Railroad Avenue, Ste. 3
                   P.O. Box 1005
                   Goshen, New York 10924
                   (845) 294-3991 [Tel]
                   (845) 294-1623 [Fax]