UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

NOREEN SHEA,                                          18 cv 11170 (CS)

      Plaintiff,

vs.

VILLAGE OF POMONA, BRETT YAGEL,

      Defendants.

-----------------------------------------------------------x

**PLAINTIFF'S RESPONSE TO DEFENDANT YAGEL'S RULE 56.1
STATEMENT and COUNTERSTATEMENT**

## I. PROCEDURAL HISTORY

1.  On or about November 3, 2017, Plaintiff filed a Verified Complaint with the New York State Division of Human Rights (the "Administrative Complaint") against The Village of Pomona. (Saccomano Aff. Ex. A at 1 ¶ 3).

**Admit**

2.  Plaintiff's Administrative Complaint alleged violations of Title VII of the Civil Rights Act of 1964, and Section 296 of the New York State Human Rights Law. (Saccomano Aff. Ex. A, at 12 ¶ 11).

**Admit**

3.  Plaintiff filed the instant Complaint on November 30, 2018. (Saccomano Aff. Ex. A).

**Admit**

4.  Plaintiff asserts a claim under Title VII of the Civil Rights Act of 1964 only against Defendant The Village of Pomona ("Defendant Village"). (Saccomano Aff. Ex. A at 8 ¶ 48).

**Admit**

5. Plaintiff asserts a claim under the Equal Protection Clause of the Fourteenth Amendment to the United Stated Constitution, as made

actionable by 42 U.S.C. § 1983, only against Defendant Yagel in his official capacity. (Saccomano Aff. Ex. A at 8 ¶ 49).

**Admit**

## II.       ABOUT DEFENDANT YAGEL

6. Defendant Yagel first ran for office in the Village of Pomona in January, 2007. (Saccomano Aff. Ex. C, at 12 ¶¶ 5-7).

**Admit**

7. Defendant Yagel was elected to the office of Trustee for the Village of Pomona in March, 2007. (Saccomano Aff. Ex. C, at 12 ¶¶ 8-16).

**Admit**

8. Defendant Yagel ran for the position of Mayor of the Village of Pomona in 2011. (Saccomano Aff. Ex. C, at 25 ¶¶ 20-24).

**Admit**

9. Defendant Yagel testified that he stated to a former employee of the Village of Pomona that "[he] d[id]n't care who [was] moving to Pomona." (Saccomano Aff. Ex. C, at 96 ¶¶ 24-25).

**Deny as hearsay – an out of court statement by defendant.  This is demonstrably false and contrary to the findings of fact rendered by Judge Karas as cited in the counterstatement below.**

10. Defendant Yagel testified that he grew up in Great Neck and "ha[s] a lot of Jewish friends." (Saccomano Aff. Ex. C, at 97 ¶¶ 2-3).

**Admit that he so testified, but see findings by Judge Karas that he engaged in intentional religious discrimination against Hasidic Jews seeking to reside in Pomona.**

III. PLAINTIFF'S EMPLOYMENT HISTORY WITH THE VILLAGE OF POMONA.
 11. Plaintiff began her employment with the Village of Pomona ("Defendant Village") on February 1, 2016. (Saccomano Aff. Ex. B, at 16 ¶¶ 30:2-4).

**Admit**

12. Plaintiff was hired in the position of Deputy Village Clerk. Id.

**Admit**

13. Plaintiff was interviewed by Defendant Yagel. (Saccomano Aff. Ex. B, at 7 ¶¶ 12:17-19).
 **Admit**

14. Plaintiff received her employment offer directly from Defendant Yagel. (Saccomano Aff. Ex. B, at 7-8 ¶¶ 16:2-3).

**Admit**

15. Plaintiff's immediate supervisor was The Village Clerk/Treasurer (referred to hereinafter as the "Village Clerk"). (Saccomano Aff. Ex. A, at 5 ¶ 25).

**Deny.  Plaintiff had two supervisors and reported to them both: Artha and Zummo, though she reported primarily to Zummo.  Shea Deposition at 26.**

16. The Village Clerk testified that she last worked for the Village of Pomona on April 2, 2019. (Saccomano Aff. Ex. E, at 10 ¶¶ 4-8).

**Admit**

17. The Village Clerk testified that Defendant Yagel never instructed her to "keep an eye on certain people" in a manner that exceeded or departed from her position's normal supervisory duties. (Saccomano Aff. Ex. E, at 46 ¶¶ 20-23).

**Deny; she so testified that the Village Clerk testified the mayor never asked her "in those terms." Artha Deposition, at 46, l. 2.  In fact, according to Zummo, Artha continually reported all of the activities of the office to the Mayor in real time. Shea Deposition at 125 and Shea Affidavit, para. 13.**

18. The Village Clerk testified that she did not hear Defendant Yagel speak to Plaintiff "about how she was interacting with the people who came into the office."

**Deny.  Yagel did make comments to plaintiff about how she was interacting with people in the office.  See Exhibit 4 to Sussman Affirmation for recordings (Shea Recordings February 3rd Part 1 at 1 hour 9 minutes-12 minutes, February 6th at 28 minutes 40 seconds-31 minutes**

18A.  The Village Clerk testified that Defendant Yagel never asked her to "keep an eye on [Plaintiff] specifically." (Saccomano Aff. Ex. E, at 122 ¶¶ 5-9).

**Admit that she so testified, but note that the Village Clerk also testified that the Defendant "called her into his private office and spoke to her about the issue." Artha Deposition, at 122, l.-123, l. 2). The Village Clerk testified, "it was a problem and sometimes she would speak and say things. And he called her into the office and..." Id. at 123, ll. 4-7. In addition, Zummo told plaintiff that Artha was the Mayor's eyes and ears and that the Mayor would frequently call her immediately after she had a positive interaction with an orthodox Jew and complain; the only other person in the office was Artha, causing plaintiff to conclude that Artha was reporting to the mayor on her activities. She Affidavit, para. 13.**

19. Plaintiff testified that 99 percent of the people "who came to [Plaintiff's] counter were Jewish, mostly Orthodox Jews." (Saccomano Aff. Ex. B, at 29 ¶¶ 56:5-6).

**Admit**

IV. PLAINTIFF'S TRAINING.

20. Plaintiff received training from Defendant Village's Building Inspector and understood that the Building Inspector worked a part time schedule. (Saccomano Aff. Ex. B, at 13 ¶¶ 24:18-20).

**Admit.**

21. Specifically, Plaintiff received training directly from the Building Inspector regarding the building permit application process. (Saccomano Aff. Ex. B, at 18 ¶¶ 34:14-18).

**Admit.**

22. Defendant Yagel advised Plaintiff that she had a certain timeframe, defined by law, within which to schedule building inspections. (Saccomano Aff. Ex. C, at 25 ¶¶ 50: 12- 18).

**Admit, but note there is no mention of a "timeframe, defined by law." Plaintiff testified that Defendant Yagel told her "make them wait, you know a week or 10 days." The mayor then questioned her when she originally scheduled the inspection the next day after the request.**

4

**Promptly scheduling inspections got plaintiff into trouble and was not favored. Shea Deposition at 25, 49, ll. 18-19, 50.**

23. Defendant Yagel did not ever explain to Plaintiff why he wanted building inspections to be scheduled within the timeframe permitted by law. Id.

**Admit but note that "timeframe by law" was not the language used. Rather, the language delaying a schedule emphasizes a penalty without reason against Mr. Hirskowitz.   (Saccomano Aff. Ex. B, at 25 ¶¶ 50: 12-18).**

24. The Village Clerk testified that Defendant Yagel never asked her to "keep an eye on [Plaintiff] specifically." (Saccomano Aff. Ex. E, at 47 ¶¶ 4-6).

**Admit**

25. The Village Clerk testified that the Building Inspector never asked her to "keep an eye on [Plaintiff] specifically." Id.

**Admit**

V.  PLAINTIFF'S ALLEGED INTERACTIONS WITH THE VILLAGE BUILDING INSPECTOR.

26. Plaintiff testified that Defendant Yagel never told her not to schedule a building inspection for someone because they were Jewish. (Saccomano Aff. Ex. B, at 29 ¶¶ 54:15-24).

**Admit but note that Plaintiff stated Defendant Yagel, "never said those words" explicitly but  "heard it in the tone. You know it was a anti-semitic atmosphere" Shea Deposition at 54, ll. 5-24; 55, ll. 22-23. (Shea Recordings: February 1st at 25 minutes 10 seconds-26 minutes, February 2nd Part 2 at 11-12 minutes, February 3rd Part 1 at 43-45 minutes, February 3rd Part 1 at 1 hour 10-14 minutes, February 3rd Part 2 at 16 minutes 30 seconds-17 minutes, March 31st at 10 minutes-10 minutes 30 seconds, March 31st Part 1 at 48 minutes-48 minutes 30 seconds)**

27. Plaintiff testified that it was Defendant Village's Building Inspector, not Defendant Yagel, who impersonated persons of the Jewish faith. (Saccomano Aff. Ex. B, at 28 ¶¶ 53:11-21).

**Deny. Plaintiff stated that both Defendant Yagel and Zummo impersonated persons of Jewish faith. Shea Deposition at 60, ll. 22-25, 61 ll. 2-20.**

28. Defendant Yagel testified that, when he learned about the Building Inspector's impersonations, he disciplined the Building Inspector immediately and told him that such comments were inappropriate. (Saccomano Aff. Ex. C, at 75 ¶¶ 2-12).

**Deny, Yagel never claims to have "disciplined" Zummo at all. Yagel claims to have told Zummo to "Stop it" with no further discipline or consequences. Yagel Deposition at 75, ll. 2-12. In fact, he admits to not disciplining Zummo despite hearing him imitate Jews on several occasions because he felt the Building Inspector was doing his job. Yagel Deposition at 74-75. (Shea Recordings February 3rd Part 1 at 1 hour 10 minutes-12 minutes, March 31st Part 1 at 48 minutes-48 minutes 30 seconds)**

29. The Building Inspector testified that he never heard Defendant Yagel refer to Plaintiff as a "Jew Lover." (Saccomano Aff. Ex. D, at 186 ¶¶ 7-25).

**Deny.  The Building Inspector repeatedly told plaintiff that Yagel did so refer to her. Shea Deposition at 115-16.**

30. The Building Inspector testified that he never stated to Plaintiff that Defendant Yagel had described her as "Jew Lover." (Saccomano Aff. Ex. D, at 186 ¶¶ 7-25).

**Deny.  The Building Inspector repeatedly told this to plaintiff. Shea Deposition at 115-16.**

31. The Village Clerk testified that she did not recall seeing the Building Inspector "[i]mitate any Jewish people." (Saccomano Aff. Ex. E, at 47 ¶¶ 9-11).

**Admit that she said this, but it is denied and false as the recordings made by plaintiff provide examples of precisely this behavior in her presence. See Shea Recordings February 3rd Part 1 at 1 hour 10 minutes-1 hour 12 minutes**

32. The Village Clerk testified that she did not ever "form a conclusion from [her] observations that there were certain people who were too persistent in

their requests of the [Village of Pomona] staff." (Saccomano Aff. Ex. E, at 103 ¶¶ 12-16).

**Deny.  Artha commented to plaintiff that Jewish residents were impatient and wanted service more quickly than she wished to provide it. Shea Affidavit, para. 14.**

33. Defendant Yagel testified that he was first told about Plaintiff's allegation that the Village Building Inspector told Plaintiff that Defendant Yagel previously referred to Plaintiff as a "Jew lover" by the New York Human Rights Commission. (Saccomano Aff. Ex. C, at 184 ¶ 25, 185 ¶¶ 2-3).

**Admit that he so testified, but the testimony is disputed because Zummo told plaintiff starting several months before her termination that Yagel was so referring to her. She Deposition at 115-16.**

34. Defendant Yagel testified that the Village Building Inspector admitted that the Village Building Inspector, not Defendant Yagel, was the one who had previously referred to Plaintiff as a "Jew lover." (Saccomano Aff. Ex. C, at 190 ¶ 25, 191 ¶¶ 2-16).

**Admit that Yagel so testified, but deny as Zummo denied that he ever admitted this to Yagel [Zummo deposition at 186] and Yagel never disciplined or took any action against Zummo after the Building Inspector admitted this to him.**

VI. PLAINTIFF'S HANDLING OF BUILDING INSPECTION PERMITS AND FOIL REQUESTS.

35. Defendant Yagel directed Plaintiff to schedule building permit inspections in accordance with governing law. (Saccomano Aff. Ex. C, at 25 ¶¶ 50: 12-18).

**Deny; plaintiff was repeatedly told to delay scheduling inspections when Zummo's schedule allowed for them to be held. Shea Deposition at 50: 12-18. (Shea Recordings: February 3rd Part 2 at 40 minutes-43 minutes, February 6th at 1 hour 20 minutes-1 hour 22 minutes, February 6th at 2 hours 28 minutes 30 seconds-2 hours 30 minutes, February 14th Part 2 at 38 minutes-39 minutes 10 seconds)**

36. Defendant Yagel testified that the Building Inspector complained about Plaintiff's scheduling of appointments. Specifically, that Plaintiff scheduled appointments and "ma[de] commitments to the residents" without first

checking with the Building Inspector to ensure he was available on the date and time scheduled. (Saccomano Aff. Ex. C, at 212 ¶¶ 19-25).

**Admit that he so testified, but Zummo made no such complaint about plaintiff and Yagel's statements were false. Plaintiff worked with Zummo to organize his schedule and spoke with him directly to resolve any issues. (Shea Recording February 6th at 24 minutes-25 minutes, February 6th at 27 minutes-29 minutes, February 6th 56 minutes-59 minute)**

37. Defendant Yagel testified that the Village Building Inspector did not mention any specific residents when he complained to Defendant Yagel about Plaintiff's practices regarding scheduling of building permit inspections. (Saccomano Aff. Ex. C, at 312 ¶¶ 2-14).

**Admit that this is what Yagel testified, but deny that the statement is true in that Zummo made no complaints of this sort about plaintiff.**

38. Defendant Yagel further testified that he observed Plaintiff responding to Freedom of Information Law ("FOIL") requests without following the proper procedures and governing laws regarding such responses. (Saccomano Aff. Ex. C, at 199 ¶¶ 7-25, 200 ¶¶ 2-5).

**Admit that he so testified that he made one such observation, but deny the truth of the conclusion drawn or that Yagel had any basis to reach the conclusion reached.  Rather, more generally, defendant Yagel directed plaintiff to delay in responding to any request for service from the Jewish constituents who requested service and expressed anger at her when she responded to the needs of members of this community. See, for example, response to paragraph 40, <u>infra.</u>**

39. Defendant Yagel questioned whether Plaintiff had executed a thorough and complete search for all files responsive to the FOIL request, to which Plaintiff responded that she "didn't need to." (Saccomano Aff. Ex. C, at 200 ¶¶ 15-20).

**Admit; and Yagel never determined whether to answer the FOIL request made, she did or did not need to.  This event occurred in the summer 2016 and could not have materially contributed to plaintiff's termination. Yagel Deposition at 200, ll. 6-13. Yagel Deposition at 199 ll. 7-25, 202, ll. 16-203, l. 2 Shea Affidavit, para. 4**

40. Defendant Yagel expressed his concern to Plaintiff that she was responding to FOIL requests without doing her "due diligence" in accordance with the duties of her position. (Saccomano Aff. Ex. C, at 200 ¶¶ 23-25, 201 ¶¶ 2-25, 202 ¶ 2).

**Deny; Yagel stated that plaintiff was too promptly responding to a FOIA request and not keeping the requesting party, a Jew, waiting longer. Yagel Deposition at 200, ll. 6-13. Yagel Deposition at 199 ll. 7-25, 202, ll.**

41. The Village Clerk testified that she never heard Defendant Yagel complain about individuals being too demanding on Village of Pomona staff. (Saccomano Aff. Ex. E at 103

¶¶ 3-6).

**Admit she said this, but it is false as tape recordings made of the Mayor in Artha's presence contradict the statement. (Shea Recordings: February 3rd Part 1 at 1 hour 10 minutes-1 hour 14 minutes, February 3rd Part 2 at 40 minutes-43 minutes, February 6th at 2 hours 28 minutes 30 seconds-2 hours 30 minutes)**

42. The Village Clerk testified that Defendant Yagel expressed his concern to the Village Clerk and Plaintiff "that [they] were a small office and a busy office because there were only two of us and that if we couldn't get to [a] FOIL request immediately, that we had the standard . . . five days and then 20 days following." (Saccomano Aff. Ex. E at 120 ¶¶ 8-14).

**Admit she so testified, but this is false.  Yagel did not express this concern; he stated that he wanted service to those coming to village hall delayed and instructed his staff to wait as long as possible to release records requested by Jewish residents. (Shea Recordings March 1st at 2 hours 34 minutes-2 hours 35 minutes)**

VII.   **DEFENDANT YAGEL'S DECISION NOT TO RE-APPOINT PLAINTIFF.**

43.  Defendant Yagel testified that he informed Plaintiff on June 23, 2017, that he would be "bringing forth another candidate to fill her position." (Saccomano Aff. Ex. C, at 164

¶¶ 14-19).

9

**Admit**

44. The Village Clerk testified that Defendant Yagel did not provide a reason for his decision not to reappoint Plaintiff. (Saccomano Aff. Ex. E at 91 ¶¶ 9-12).

**Admit**

45. The Village Clerk testified that Defendant Yagel stated that he did not have to have a reason not to reappoint Plaintiff. (Saccomano Aff. Ex. E, at 91 ¶¶ 13-17).

**Admit**

46. Plaintiff admits that Defendant Yagel was acting in his official capacity as Mayor of The Village of Pomona when he made the decision not to re-appoint Plaintiff. (Saccomano Aff. Ex. A, at 3 ¶ 13).

**Deny as stated as he was acting in his official and individual capacities.**

**Counterstatement**

I. **Anti-Semitism Pervaded Plaintiff's Work Environment**

1. In or about late January 2017, plaintiff commenced taping Yagel and Zummo because she found their conversations offensive and wanted to record their antisemitic comments. Shea Deposition at 191. The recordings are date and time stamped on plaintiff's phone. Id. at 189. Plaintiff was present when she recorded the conversations. Id. at 193.

2. The recordings are date and time stamped on plaintiff's phone. Id. at 189.

3. Plaintiff was present when she recorded the conversations. Id. at 193. Plaintiff heard Yagel make derogatory comments about a number of Hasidic/Orthodox developers/landowners, including, but not limited to, Manes, Indig, Klein and Hirskowitz. Id. at 195-216. Shea Recordings: February

1st at 25 minutes 10 seconds-26 minutes, February 2nd Part 2 at 11-12 minutes, February 3rd Part 1 at 43-45 minutes, February 3rd Part 1 at 1 hour 10-14 minutes, February 3rd Part 2 at 16 minutes 30 seconds-17 minutes, February 3rd Part 2 at 39 minutes- March 31st at 10 minutes-10 minutes 30 seconds, March 31st Part 1 at 48 minutes-48 minutes 30 seconds

4.  These stereotypic comments typically involved their desire to violate the law for the sake of making money. Shea Affidavit at para. 14. Shea Recordings February 3rd Part 1 at 1 hour 10 minutes-1 hour 14 minutes, February 3rd Part 2 at 39-40 minutes, February 14th Part 2 at 38-39 minutes

5 .On February 1, 2017, Defendant Brett Yagel discussed alleged property violations at the home of a Jewish resident with Building Inspector Louis Zummo (Zummo). Shea Recording February 1st at 0-2 minutes

6.  Upon learning of the size of new additions to the home, Defendant Yagel remarked, "Is he building it for a Synagogue?" Shea Recording February 1st at 0 minutes 50 seconds

7.  Defendant Yagel was aware that this property was a place of residence and not a designated place of worship. Shea Recording February 1st at 0 minutes-2 minutes

8.  On the same day, Defendant Yagel spoke with an official at the Town of Ramapo to discuss a list of tax-exempt properties. Shea Recording February 1st at 1 hour 17 minutes 20 seconds

9.  Defendant Yagel asserted that some single-family homes were being given tax-exempt status by claiming to be houses of worship. Shea Recording February 1st at 1 hour 17 minutes 50 seconds

10.  Defendant Yagel implied that residents of these homes were "trying to skirt the law." Shea Recording February 1st at 1 hour 23 minutes 30 seconds

11.  On February 3, 2017, Defendant Yagel and Zummo discussed a code violation that Zummo had recently given out in the Village of Airmont. Shea Recording February 3rd Part 1 at 43-44 minutes

12.  At this time, Zummo worked part-time as the Building Inspector in the Village of Airmont, as well as part-time as the Building Inspector in the Village of Pomona. Zummo Transcript Pages 56-57

13.  Zummo laughed as he told Defendant Yagel that "a Hasidic house-flipper" in the Village of Airmont had recently been fined $12,500 for violating a stop-work order and for working without a permit. Shea Recording February 3rd Part 1 at 44 minutes

14.  Defendant Yagel responded, "That's what we need over here," in reference to the Village of Pomona. Shea Recording February 3rd Part 1 at 44 minutes 17 seconds

15.  Defendant Yagel stated that he wanted to start "banging these house-flippers," implying that he wanted to issue large fines to Hasidic contractors. Shea Recording February 3rd Part 1 at 44 minutes 19 seconds

16.  Zummo further stated, "We gotta stop people like that," implying that the Village should take action against Hasidic contractors. Shea Recording February 3rd Part 1 at 44 minutes 50 seconds

17.  In the same conversation, Defendant Yagel stated, "I want the maximum on that property. The absolute maximum," when referring to a property being worked on by a Jewish builder. Shea Recording February 3rd Part 1 at 45 minutes 3 seconds

18.  By saying this, Defendant Yagel implied that Zummo should issue the largest fine possible to the Jewish builder.

19.  On the same day, Defendant Yagel was present when two Jewish residents entered the office and went to the counter for assistance. Shea Recording February 3rd Part 1 at 51 minutes 40 seconds

20. The residents asked Plaintiff and Zummo questions about Village rules concerning the placement of shipping containers, mobile homes and tiny homes on a specific property. Shea Recording February 3rd Part 1 at 52 minutes-1 hour 1 minute

21. Zummo answered their questions and told the residents that the Village does not permit shipping containers, mobile homes, or tiny homes on properties, unless they are built behind a larger main home. Shea Recording February 3rd Part 1 at 52 minutes-1 hour 1 minute

22.  The residents thanked Plaintiff and Zummo for their help and left. Shea Recording February 3rd Part 1 at 1 hour 1 minute

23. Defendant Yagel later inquired what the residents had needed help with. Shea Recording February 3rd Part 1 at 1 hour 10 minutes 55 seconds

24.  Zummo did a mocking impersonation of one of the men asking to put 4-5 tiny homes on one property. Shea Recording February 3rd Part 1 at 1 hour 11 minutes- 1 hour 12 minutes 20 seconds

25.  Defendant Yagel did not address the inappropriate impersonation or the mocking tone of his employee Shea Recording February 3rd Part 1 at 1 hour 11 minutes- 1 hour 12 minutes 20 seconds

26.  Rather, defendant Yagel reacted, "People like that, look at the code. Don't even give them information." Shea Recording February 3rd Part 1 at 1 hour 12 minutes 25 seconds

27. Defendant Yagel implied that Zummo and Plaintiff should not assist Jewish residents or answer their questions.

28.  Defendant Yagel further stated, "These two bozos that come in here, they can FOIL. Our laws are online. Please don't give any more information out because--let them talk, and as much as they're going to aggravate, don't say a fucking word. Because they're trying their hardest. You know they're trying their fucking hardest" while referring to the two Jewish residents who had exited the room. Shea Recording February 3rd Part 1 at 1 hour 13 minutes 9 seconds

29.  Defendant Yagel instructed Zummo and Plaintiff to give Jewish residents additional paperwork instead of answering their questions directly. Shea Recording February 3rd Part 1 at 1 hour 13 minutes 9 seconds

30.  Defendant Yagel further implied that the two Jewish residents had been attempting to aggravate or trick Zummo and Plaintiff. Shea Recording February 3rd Part 1 at 1 hour 13 minutes 9 seconds

31.  The two Jewish residents were friendly with Zummo and Plaintiff and did nothing to suggest that they would violate Village law. Shea Recording February 3rd Part 1 at 52 minutes-1 hour 1 minute

32.  Also on February 3rd, Defendant Yagel and Zummo discussed the progress of projects of a Jewish builder, Mr. Hirskowitz. Shea Recording February 3rd Part 2 at 39 minutes 3 seconds-10 seconds

33.  Defendant Yagel expressed surprise that this builder had moved his projects along so quickly. Shea Recording February 3rd Part 2 at 39 minutes 3 seconds-10 seconds

34.  Defendant Yagel asked Zummo, "There's two more fucking houses. What the hell is going on?", with reference to the speed of these projects. Shea Recording February 3rd Part 2 at 39 minutes 13 seconds

35. Zummo responded, "He's making monies." Shea Recording February 3rd Part 2 at 39 minutes 15 seconds

36.  Instead of addressing his staff member's Jewish stereotype, Defendant Yagel responded with, "That's fine, but I have to call and thank him for saving me a plot in the cemetery," then laughed. Shea Recording February 3rd Part 2 at 39 minutes 18 seconds

37.  This comment was a reference to the fact that the same Jewish builder was currently being sued by the Village for building on an alleged cemetery. Shea Recording February 2nd Part 2 at 19 minutes 45 seconds-20 minutes 40 seconds

38.  On the same day, Defendant Yagel was present in the office when the phone rang. Shea Recording February 3rd Part 2 at 16 minutes 25 seconds

39.  After Plaintiff answered the phone, Defendant Yagel stated, "I bet it's Schlomo Fuerst. If it is, hang up." Shea Recording February 3rd Part 2 at 16 minutes 55 seconds

40.  Zummo told Defendant Yagel that Mr. Fuerst's first name is Solomon, not Schlomo. Shea Recording February 3rd Part 2 at 17 minutes

41.  Defendant Yagel replied by saying, "Whatever," in an annoyed tone. Shea Recording February 3rd Part 2 at 17 minutes 1 second

42.  On the same day, Defendant Yagel learned that Zummo had scheduled a meeting with Mr. Fuerst, a Jewish realtor, to discuss a specific property. Shea Recording February 3rd Part 2 at 40 minutes

43.  Defendant Yagel again referred to Mr. Fuerst as "Schlomo" and was again corrected by Zummo. Shea Recording February 3rd Part 2 at 40 minutes

44.  Defendant Yagel asked why Zummo was meeting with Mr. Fuerst and asked whether Mr. Fuerst owns any property in the Village. Shea Recording February 3rd Part 2 at 40 minutes 18-25 seconds

45. Zummo informed Defendant Yagel that Mr. Fuerst owns four lots of property in the Village. Shea Recording February 3rd Part 2 at 40 minutes 29 seconds

46.  Zummo told Defendant Yagel that he agreed to meet with Mr. Fuerst and a Jewish doctor who is interested in purchasing a million-dollar home in the Village. Shea Recording February 3rd Part 2 at 40 minutes 38 seconds

47.  Defendant Yagel stated, "You are not their personal building inspector." Shea Recording February 3rd Part 2 at 41 minutes 38 seconds

48.  Defendant Yagel told Zummo that he should not meet with Mr. Fuerst. Shea Recording February 3rd Part 2 at 42 minutes

49.  Defendant Yagel stated, "Have him put it in writing. Have them put everything in writing. They have questions, they can put it in writing." Shea Recording February 3rd Part 2 at 42 minutes 42 seconds

50.  Zummo explained that the potential buyer needed to see the building plans submitted to the Village because the previous homeowner was unable to provide accurate records and the buyer needed to know of any violations on the property. Shea Recording February 3rd Part 2 at 46 minutes 20 seconds-35 seconds

51.  Defendant Yagel instructed his staff to delay working with Mr. Fuerst and the Jewish doctor. Shea Recording February 3rd Part 2 at 42 minutes 42 seconds

52.  On February 6, 2017, Zummo and Plaintiff discussed setting up a
Technical Advisory Committee (TAC) meeting for a Jewish resident, Mr. Ecker.
Shea Recording February 6th at 27 minutes

53.  The TAC meeting was necessary for Mr. Ecker to gain approval of his plans
to pave the roads near his home. Shea Recordings February 6th at 28 minutes-
28 minutes 30 seconds

54.  Plaintiff suggested to Zummo that she could contact Mr. Brady, the Acting
Village Engineer, to work out scheduling. Shea Recording February 6th at 29
minutes

55.  Zummo agreed that Plaintiff should contact Mr. Brady and try to schedule
the meeting. Shea Recording February 6th at 29 minutes 2 seconds

56.  Plaintiff began to search for Mr. Brady's phone number. Shea Recording
February 6th at 29 minutes 30 seconds

57.  Defendant Yagel later called the office and asked Plaintiff why she needed
Mr. Brady's phone number. Shea Recording February 6th at 1 hour 15 minutes
3 seconds-25 seconds

58.  Plaintiff picked up the phone and told Defendant Yagel that they needed
Mr. Brady's phone number to schedule Mr. Ecker's TAC meeting.. Shea
Recording February 6th at 1 hour 15 minutes 3 seconds-25 seconds

59.  Defendant Yagel then asked to speak with Zummo. Shea Recording February 6th 1 hour 15 minutes 43 seconds

60.  Zummo picked up the phone and told Defendant Yagel that the TAC meeting was necessary to discuss the paving of the road leading to the site for Mr. Ecker's home. Shea Recording February 6th 1 hour 16 minutes

61.  Zummo spoke with Defendant Yagel for several minutes and discussed Mr. Ecker's plans to pave High Mountain, then hung up. Shea Recording February 6th 1 hour 16 minutes-17 minutes 50 seconds

62.  Plaintiff asked Zummo again about Pat Brady's phone number. Shea Recordings February 6th at 1 hour 19 minutes 58 seconds

63.  Zummo told Plaintiff, "You ain't getting' it." Shea Recording February 6th at 1 hour 20 minutes

64.  Zummo told Plaintiff, "Brett said no TAC meeting." Shea Recording February 6th at 1 hour 20 minutes 4 seconds

65.  Zummo told Plaintiff that Defendant Yagel had told him, "Nobody's rushing to give Mr. Ecker a TAC meeting." Shea Recording February 6th at 1 hour 20 minutes 12 seconds

66.  Zummo told Plaintiff that Defendant Yagel would not allow a TAC meeting to happen until attorneys looked into Mr. Ecker's situation. Shea Recording February 6th at 1 hour 20 minutes 45 seconds

67.   Later the same day, Defendant Yagel returned to the office and inquired of his staff, "So who's pushing the TAC meeting?" Shea Recording February 6th at 2 hours 28 minutes 40 seconds

68.   Plaintiff explained to Defendant Yagel that she had been asked by Mr. Ecker to schedule the meeting so that his plans could move forward. Shea Recording February 6th at 2 hours 28 minutes 50 seconds

69.   Defendant Yagel replied, "They don't have the right to tell you to set it up. No, absolutely not." Shea Recording February 6th at 2 hours 28 minutes 54 seconds-2 hours 29 minutes 7 seconds

70.   By this, Defendant Yagel meant that Plaintiff should not schedule the meeting with Mr. Ecker. Shea Recording February 6th at 2 hours 28 minutes 54 seconds-2 hours 29 minutes 7 seconds

71.   Defendant Yagel instructed Plaintiff and Zummo to unnecessarily delay the scheduling of a meeting for a Jewish resident. Shea Recording February 6th at 2 hours 28 minutes 54 seconds-2 hours 29 minutes 7 seconds

72.   On February 10, 2017, Defendant Yagel personally called a resident, Steve Hodavonic, to discuss his appearance as a witness in a court case against Sima Abensen, an Orthodox realtor. Shea Recording February 10th Part 1 at 7 minutes 12 seconds-7 minutes 55 seconds

73.  Mr. Hodavonic told Defendant Yagel that he was not able to attend court on the specified date. Shea Recording February 10th Part 1 at 8 minutes 20 seconds

74.  Defendant Yagel told Mr. Hodavonic that he would try to change the court date to ensure that he was able to attend as a witness. Shea Recording February 10th Part 1 at 8 minutes 26-55 seconds

75.  Defendant Yagel then called Christopher Riley, the prosecuting attorney, to attempt to change the court date. Shea Recording February 10th Part 1 at 9 minutes-10 minutes

76.  While speaking with Mr. Riley, Defendant Yagel learned that Ms. Abensen was planning on pleading guilty during the next court date. February 10th Part 1 at 20 minutes

77.  Defendant Yagel told Mr. Riley, "Get her for the maximum fine, because she's a fucking idiot and she's a nasty, nasty bitch." Shea Recording February 10th Part 1 at 19 minutes 15 seconds

78. Defendant Yagel told Mr. Riley, "Full fine, baby. Five hundred bucks. That'll jerk her around." Shea Recording February 10th Part 1 at 19 minutes 45 seconds

79.  Defendant Yagel was not a Village attorney and was not responsible for scheduling court dates or working out plea deals.

80. On February 13, 2017, Zummo told Plaintiff that he would be meeting with the United Talmudical Association (UTA) during the week. Shea Recording February 13th at 1 hour 30 seconds.

81. Zummo told Plaintiff that the UTA wanted approval and documentation for a school on Cherry Lane at the site of a former camp. Shea Recording at 1 hour 38 seconds

82. Zummo described himself as "the mean bastard stopping them from doing it." Shea Recording at 1 hour 40 seconds.

83. Zummo explained to Plaintiff alleged issues with the UTA's documentation and stated that he had explained it to them and to their "fucking lawyers" multiple times. Shea Recording at 1 hour 50 seconds- 1 hour 1 minute 10 seconds.

84. Zummo then mocks a stereotypical response of the UTA in a Jewish accent, "I don't understand, why can't you do this for me? What would make it illegal? Because it's a Jewish school?" Shea Recording 1 hour 1 minute 20 seconds- 40 seconds

85. Zummo further mentions wearing a "Hitler-was-right hat." Shea Recording 1 hour 2 minutes

86.  On February 14, 2017, Defendant Yagel and Plaintiff had a discussion about the home of a Jewish resident, Aaron Cohen, which recently had a fire. Shea Recordings February 14th Part 1 at 8 minutes 49 seconds

87.  Plaintiff asked Defendant Yagel what happened at the home and where the fire took place. Shea Recordings February 14th Part 1 at 8 minutes 49 seconds

88.  Defendant Yagel replied, "Cohen's a bitch." Shea Recordings February 14th Part 1 at 8 minutes 55 seconds

89.  Later the same day, Plaintiff discusses scheduling an early morning inspection of Mr. Cohen's home. Shea Recording February 14th Part 2 at 38 minutes 12 -20 seconds

90.  Defendant Yagel told Plaintiff that she does not have to schedule it early in the morning and says, "Well Mr. Cohen wants it before the first, because you know why, that's when the tax assessment gets reduced. That's why Aaron Cohen is all over this." Shea Recordings February 14th Part 2 at 38 minutes 35 seconds

91.  Defendant Yagel further stated, "Why should the rest of us pay for it because you have fire damage?" Shea Recordings February 14th Part 2 at 38 minutes 50 seconds

92.  Defendant Yagel implied that Mr. Cohen was trying to cheat the Village of taxes.

93.  On March 1, 2017, Defendant Yagel and Zummo discussed a violation at the home of a Jewish resident. Shea Recording March 1st at 8 minutes 25 seconds-9 minutes 20 seconds

94.  Zummo stated, "The Jewish mentality works that way. I could go over there every day and they're going to go and do what they want because they don't want restrictions. They're like 6 year olds." Shea Recording March 1st at 9 minutes 27 seconds

95.  Defendant Yagel did not address this comment or correct his staff member's religious stereotyping.

96.  The same day, a Hasidic resident entered the office while Defendant Yagel, Zummo, and Plaintiff were present. Shea Recording March 1st at 34 minutes 30 seconds

97. Zummo recalled inspecting the resident's kitchen on a previous occasion and spoke with her at the counter for several minutes. Shea Recording March 1st at 34 minutes 34 seconds

98.  Both Zummo and Defendant Yagel spoke with the resident in a friendly tone and remarked on her unusual accent. Shea Recording March 1st at 34 minutes 40 seconds-46 minutes 30 seconds

99.  The resident told them that she had moved to the Village two years ago. Shea Recording March 1st at 41 minutes 10 seconds

100. After the resident left, Zummo remarked that, "For a Hasidic woman, she was very normal." Shea Recording March 1st at 51 minutes 20 seconds

101. Defendant Yagel did not condemn Zummo's remark and instead replied, "She's not from around here, that's why." Shea Recording March 1st at 51 minutes 25 seconds

102. On March 3, 2017, Defendant Yagel and Zummo discussed the work of an Orthodox Jewish builder in the Village. Shea Recording March 3rd Part 2 at 50 minutes 40 seconds

103. Zummo told the Mayor that he suspected the builder was planning to add apartments in the basement of a home, but that he had not yet received the final plans. Shea Recording March 3rd Part 2 at 50 minutes 40 seconds- 51 minutes

104. Defendant Yagel asked Plaintiff if the builder had submitted a check to the Village. Shea Recording March 3rd Part 2 at 51 minutes

105. The Plaintiff told Defendant Yagel that the builder had not yet submitted a check. Shea Recording March 3rd Part 2 at 51 minutes 2 seconds

106. Defendant Yagel told Plaintiff and Zummo, "Have him write a check. Accept the plans. Cash the check. Then write him a letter, and deny." Shea Recording March 3rd Part 2 at 51 minutes 3 seconds-10 seconds

107. Defendant Yagel further stated, "Can we get his license pulled? He's a slimy bag." Shea Recording March 3rd Part 2 at 53 minutes 5 seconds

108. Defendant Yagel then commented that he thought the builder's "skin color doesn't look right." Shea Recording March 3rd Part 2 at 53 minutes 17 seconds

109. On the same day, Zummo and Plaintiff discussed a vehicle fine received by a worker who drove to Ulster County to complete a job for a Jewish resident. Shea Recording March 3rd Part 1 at 1 hour 31 minutes 30 seconds.

110. Zummo mimicked the speech of a Jewish man asking the worker to come to complete a job. Shea Recording March 3rd Part 1 at 1 hour 31 minutes 55 seconds

111. Also on March 3rd, Plaintiff, Zummo, and Fran Arsa Artha (Artha) were present in the office when a resident came to the counter to ask about Village code involving the parking of ambulances and police cars. Shea Recording March 3rd Part 2 at 1 hour 14 minutes 50 seconds

112. The resident complained that multiple police cars and ambulances from the Town of Ramapo were parked on her street. Shea Recording March 3rd Part 2 at 1 hour 15 minutes-16 minutes

113. Artha then told the resident, "You know what they use those ambulances for? Chauffeurs." Shea Recording March 3rd Part 2at 1 hour 16 minutes 55 seconds

114. Zummo tells the resident, "They use them to shuttle rabbis in. They get away with it all the time." Shea Recording March 3rd Part 2 at 1 hour 17 minutes

115. Zummo further tells the resident, "They use the lights and sirens. The police won't stop an ambulance." Shea Recording March 3rd Part 2 at 1 hour 17 minutes 30 seconds

116. By this, Zummo implied that Jewish residents in the Village were breaking the law by using ambulances for their own religious purposes. Shea Recording March 3rd Part 2 at 1 hour 17 minutes 30 seconds

117.  On March 31, 2017, Plaintiff, Defendant Yagel, and Zummo discussed an upcoming inspection for a Jewish resident. Shea Recording March 31st Part 1 at 47 minutes 45 seconds

118. Defendant Yagel states he spoke with the resident previously and warned him to get his property inspected before started work on the plumbing system. Shea Recording March 31st Part 1 at 48 minutes 5 seconds

119. Zummo then mimicked the Jewish homeowner stating, "In Brooklyn and in Ramapo this does not happen."

120. Defendant Yagel did not address this mimicking behavior and did not issue any discipline for the inappropriate behavior.

121. On March 31, 2017, Defendant Yagel and Zummo discussed the removal of trees at an Orthodox Jewish home in the Village. Shea Recording March 31st Part 1 at 10 minutes

122. Zummo stated, "That's the way the Orthodox like it, 'I don't want to maintain anything. I don't want anything near my house. I want a nice big flat yard for my kids to play in. So I'm going to clear anything that grows.'" Shea Recording March 31st Part 1 at 10 minutes 12 seconds-22 seconds

123. Defendant Yagel did not address this stereotyped statement from his staff member.

124. The same day, Defendant Yagel, Plaintiff, and Zummo discussed a home being built by an Orthodox Jewish builder. Shea Recording March 31st Part 1 at 11 minutes

125. Zummo told Defendant Yagel that the building plans for the property contained several different structures and required building close to the property line. Shea Recording March 31st Part 1 at 12 minutes 10 seconds-12 minutes 40 seconds.

126.  Defendant Yagel asked why the department was allowing the property to move forward and was not denying the plans. Shea Recording March 31st Part 1 at 12 minutes 44 seconds.

127.  Plaintiff explained to Defendant Yagel that the builder had already attended two TAC meetings to receive approval and only needed approval from the Planning Board at that point. Shea Recording March 31st Part 1 at 12 minutes 57 seconds

128.  Defendant Yagel then suggested that an attorney should attend the Planning Board meeting with the builder. Shea Recording March 31st Part 1 at 12 minutes 55 seconds

129.  In discussing the plan for a wall around this property, Zummo stated that he told the builder, "This isn't Tel Aviv. Cut it back." Shea Recording March 31st Part 1 at 16 minutes 35 seconds

130. Defendant Yagel did not address this statement and instead suggested that the builder should plant arborvitae trees to create his wall. Shea Recording March 31st Part 1 at 17 minutes 4 seconds

131. Plaintiff heard Yagel make derogatory comments about a number of Hasidic/Orthodox developers/landowners, including, but not limited to, Manes, Indig, Klein and Hirskowitz. Id. at 195-216.  These stereotypic comments typically involved their desire to violate the law for the sake of making money. Shea Affidavit at para. 14.

131A.  Defendant Yagel and Louis Zummo, her supervisor and the building inspector, repeatedly directed plaintiff to slow down the processing of applications, responses to FOIA requests or any other service she was engaged in performing for Hasidic/Orthodox people.  Shea Affidavit, para. 15.

132.  Plaintiff often expressed concern with these directions, making clear that she saw no reason to delay processing responses to requests or applications. Id.

II. **PLAINTIFF'S HIRING AND REPORTING RELATIONSHIPS**

133.  Plaintiff and Nick Wilson, a member of the Village Board of Trustees, were "old friends" as of late 2015. Shea Deposition at 9.

134.  At a New Year's Eve Party on December 31, 2015, Wilson suggested that plaintiff's background made her an ideal candidate for the position of Deputy Clerk.  Id. at 10, 35-36.

135.  Plaintiff then interviewed at Village Hall with Mayor Yagel, deputy Mayor Leon Harris and Francis Arsa Artha. Id. at 13.

136.  At the interview, Yagel told plaintiff that the Village had a lot of problems that somebody needed to clean up, specifically "expired permits." Id.

137.  After the interview, the Mayor called and offered her the job. Id. at 16.

138.   Defendant Yagel told plaintiff she would be working for the Building Inspector, Louis Zummo. Id. at 16.

139.   The deputy clerk worked from 9-4 each day and earned $50,000. Id. at 16.

140.   Plaintiff commenced work on February 1, 2016. Id. at 22, 30.

141.   Plaintiff understood Zummo was her "boss." Id. at 26.

142.   Artha claimed she was plaintiff's boss.  Id.

143.   The Mayor stated he was the boss. Id.

144.   To plaintiff, everyone was her boss. Id.

145.   She reported mostly to the Building Inspector. Id.

III.   **PLAINTIFF'S TRAINING and ASSIGNMENTS**

146.   The first priority for plaintiff was to close out expired building permits with the Building Inspector. Id. at 17.

147.   Plaintiff's predecessor gave her training, which was a "joke." Id. at 18.

148.   "I'd say we cleaned off her desk...she'd be singing and dancing in the office and I'd be looking at Fran like...she has to show me what we're doing here.  We basically cleaned her desk that was stacked this high [three or four feet] you couldn't see it." Id. at 19.

149.  Carol told plaintiff about the application for building permits. Id. at 20.

150.  When plaintiff asked her what to do with the completed application, Carol told her "you stick it up your ass." Id.

151.  Plaintiff was not cross-trained to do the job of the Village Clerk, Arsa Artha though this was the contemplation for her position. Id. at 26-27, 152.

152.  Zummo told plaintiff that Artha would never cross-train her. Id. at 154, ll. 17-19.

153.  About a year after she started with the Village, Artha gave her two typed sheets of paper which said "duties of the deputy clerk" and told her to type the list immediately and email it to defendant Yagel. Id. at 28-29.

154.  Plaintiff started to scan the already typed-paper to the Mayor. Id. at 29.

Artha directed her to re-type it; plaintiff explained she did not understand. Id.

155.  Plaintiff had not received training on each of these alleged job duties. Id. at 29.

156.  Building permits were supposed to be issued 30 days after the filing of a complete application. Id. at 36.

157.  Plaintiff worked closely with Zummo in setting up a schedule for him to do property inspections. Id. at 44.

158. Plaintiff scheduled inspections on an as needed basis, entered those scheduled on a outlook calendar and sent the schedule to both Zummo and Yagel. Id. at 47-48.

159. Zummo never complained to plaintiff about the way she was scheduling inspections. Id. at 47.

## IV. **THE ANTI-SEMITIC CONDUCT OF DEFENDANT YAGEL DEFINES THE WORK ENVIRONMENT**

160. Defendant Yagel was present a great deal at the office. Id. at 50-51, 58.

161. Often, Defendant Yagel stood at the counter where the public sought service. Id. at 58.

162. Defendant Yagel frequently interfered with the inspection schedule, calling Zummo into his office when the Building Inspector was supposed to be conducting an inspection. Id. at 47.

163. In many instances, including, but not limited to, Manes, Hirskowitz, Indig and Klein, Jewish applicants had to wait extensively for approvals of permits. Shea Affidavit at 15.

164. When asked to explain why Klein's application was so delayed, plaintiff recalled "all the sarcastic comments," a reference to claims by Yagel and Zummo that Klein was building a "hotel." Id. and Shea Deposition at 41.

34

165. Another Orthodox Jew, Hirskowitz, was building 41 homes in the Village. Id. at 49.

166. He had a substantial need for inspections by Zummo. Id.

167. On one occasion, after another inspection cancelled, plaintiff scheduled Zummo to do an inspection of one of Hirskowitz's properties the following day. Id. at 49.

168. Yagel interfered, questioning why plaintiff "put him on so fast." Id. at 50.

169. Frequently, Yagel told plaintiff that "you can make them wait, a week or ten days." Id.

170. At first, plaintiff did not understand why the Mayor would interfere in this manner with the scheduling. Id. at 51.

171. Yagel would not explain his direction to delay. Id. at 54.

172. He would simply say, "you can make them wait ten days." Id. at 54.

173. Plaintiff asked Zummo why the Mayor was behaving in this manner. Id. at 51-52.

174. Zummo replied, "you're helping the Jews, that's why," and he would make that statement using a Jewish accent. Id. at 52.

175. Plaintiff would explain that she scheduled the appointment because of a cancellation and Zummo would tell her "no, no, no." Id.

176. Asked for other examples of the same issue, plaintiff responded, "A lot ---
honestly all the FOIL requests, all the inspections." Id.

177. Zummo explained to plaintiff that there were four or five levels of Jews
and "the lowest are the real Hasids" and he did this "whole impression" of
them. Id. at 53.

178. When asked what direct comments Yagel made which suggested his anti-
semitism, plaintiff recalled "the classic one,", "Go buy pork rinds for our guests
when they come in, ha, ha ha." Id. at 56.

179. 99% of the people who came to the counter asking for help were Hasidic
or Orthodox Jews. Id.

180. While Yagel did not say, "don't give the Jews permits," plaintiff explained
that you felt anti-semitism permeating the environment. Id. at 57.

181. Plaintiff recalled promptly processing 18 FOIL requests and Artha
directing her to make the requestor wait and counting the number of days left
before plaintiff had to respond to each. Id. at 57-58.

182. Likewise, applicants would call the office inquiring about their permits
and plaintiff would ask Zummo for the status. Id. at 60.

183. Zummo would respond that he could not issue a permit too fast or the
Mayor would kill him. Id.

184.  Zummo and Yagel together impersonated Jews: "they always did their – "we got the monies" – you know, they were always doing this banter back and forth..." Id. at 61.

185.  Zummo frequently imitated Jews at work on various occasions, several times in the presence of the Mayor. Shea Deposition at 121-22.

186.  Plaintiff related that a Jewish woman came into the office and told plaintiff she was selling Avon.  After she left, Zummo "was like, see, all the Jews they go to make the monies.  Even the wife has to make the monies. Everybody's got to make the monies.  And he would just walk around the office doing this." Id. at 122.

187.  According to Shea, "[E]very day it was that environment and so you saw, you felt it, you knew it." Id.

188.  Right after she started working, the Mayor told plaintiff to record the Orthodox when they came into the office. Id. at 155, 156.

189.  Specifically, he directed her to record that "bitch", Naomi Streiker, when she entered village hall.  Id. at 190-91.

190.  Yagel showed plaintiff how to make recordings on her phone. Id.

191.  Plaintiff recorded a few interactions with Orthodox people, decided doing so was wrong and began recording the Mayor. Id. at 155-56.

192.  Plaintiff responded to FOIA requests relating to the responsibilities of the Building Department, the Planning Board and the Zoning Board of Appeals. Id. at 67-68.

193. Plaintiff observed little progress on closing expired permits. Id. at 71-72.

194. Zummo was part-time and reluctant to work on expired permits. Id. at 72.

195. Plaintiff explained Zummo's reluctance to Yagel. Id.

196. When asked why there was such a backlog in permits, plaintiff responded, "You felt this anti-semitism. They're taking over. They're taking over the village. The Orthodox are taking over the village.  It was a slow-down process." Id. at 73.

V.  **PRETEXTUAL BASES FOR ADVERSE ACTION**

**a.  Death Certificate Issue**

197.  Plaintiff received no training with regard to death certificates until after Artha returned from her vacation in July 2016. Id. at 74.

198. Before then, Artha did every one and the village paid her "a little cash on the side" for doing them. Id.

199.  Before leaving for vacation, plaintiff had asked Artha what to do if someone died when she was away. Id. at 76.

200. Artha responded that nobody will die. Id.

201.  Two people did die while Artha was away. Id.

202.  Plaintiff contacted knowledgeable persons and completed the death certificates, but her cover letter included the wrong date, June instead of July. Id. at 76-77.

203.  When Fran returned from vacation, she complained that plaintiff had not sent the certificate registered mail, though plaintiff knew of no such require-ment. Id. at 77.

b. **Response to FOIL/FOIA requests**

204.  Often, people seeking to buy property in Pomona would fill out a FOIA request and ask for a survey of the property or the property file. Id. at 62.

205. Plaintiff would get the survey and make a copy, collecting 25 cents. Id. at 62.

206.  Plaintiff would not respond to complex FOIL requests without getting approval from Artha, the Mayor or Doris Ullman, Esq., the village attorney. Id. 63, 66.

207.  Plaintiff well understood the issue: she explained that Orthodox Jews would come to the counter, ask for a property survey through a FOIL; she would say "sure" and process the FOIL as they waited. Id. at 118.

208.  The process of responding took less than two minutes. Id. at 118-19.

209. Zummo reported to plaintiff that Artha would report these interactions to the Mayor. Id. at 119.

210. Zummo told plaintiff she could make the requester wait five days. Id.

211. She responded, "Why should I make them wait?" Id.

212. This occurred on a daily basis. Id.

212A. Plaintiff received no counseling memorandum concerning her job performance. Shea Affidavit at 11.

212B. In April 2017, plaintiff received a raise from the Village Board. Id.

## V. **PLAINTIFF'S "EXPECTED" TERMINATION**

213. Plaintiff was terminated on June 23, 2017. Id. at 110.

214. This occurred immediately after plaintiff had given Mr. Hirskowitz a Certificate of Occupancy while Yagel was angrily pacing around the office. Id. at 111.

215. Plaintiff was not surprised by her termination; indeed, she expected it. Id. at 113.

216. Plaintiff expected her termination because Zummo had told her that the Mayor was looking to get rid of her because she was a "Jew lover". Id. at 114.

217. Zummo repeated this 3 or 4 times during the last several months of plaintiff's employment. Id. at 115.

218. Her supervisor, Zummo, explained to plaintiff that Yagel called her this name because she helped Jewish residents and was courteous to them. Id. at 116.

219. In the spring 2017, an Orthodox man, Avrohom Manes, brought his beautiful little baby to the office. Id. at 124.

220. Shea kibitzed with Manes in a pleasant manner. Id. at 124.

221. The Mayor was not present, but later told her that she should not have such friendly conversation and should have just asked if she could help Manes. Id. at 124.

222. Zummo further explained to plaintiff that Yagel wanted to bring to Pomona his assistant from Airmont, Betty. Id. at 115.

223. Zummo explained that Betty hid him in the back of the office, did not have him answer calls from Jews or see them. Id.

224. On another occasion, before her termination, a woman came to the counter and indicated she had a job interview with the Mayor. Id. at 117.

225. Plaintiff asked for what position and Artha did not answer her and directed her to ask the Mayor. Id.

226. Zummo told plaintiff to start looking for another job. Id.

## VI. BEFORE SHE WAS TERMINATED PLAINTIFF COMPLAINED TO OTHER TRUSTEES AND THE VILLAGE ATTORNEY ABOUT THE ANTI-SEMITISM SHE EXPERIENCED

227.  In February 2017, plaintiff complained to the village attorney about the whole antisemitic environment she experienced at work. Id. at 149-150; 222, l. 24-223, l.5.

228. Plaintiff also informed Ms. Ullman about specific situations – "I told her it's very antisemitic the way he [Hirskowitz] is treated, the way they want me to delay his inspections…" Id. at 223.

229.  She also discussed with Ms. Ullman the treatment accorded the Indigs, querying why a year had passed since issuance of their permit. Id. at 224.

230.  Plaintiff also told Jerry Fox, a Planning Board member who was helping her buy a condo, that her job was not secure and that the Mayor had called her a "Jew lover." Id. at 225-26.

231.  As a result, plaintiff and Fox stopped looking at properties for her. Id. at 230.

232.  Plaintiff also spoke with Nick Wilson, a member of the Village Board of Trustees, dozens of times about the work environment and, more specifically, about the Mayor authorizing discriminatory practices against Jewish residents and builders. Id. at 226, 231.

233. Wilson responded in a wishy-washy way, advising plaintiff to "keep her head down, do her job, get your pay check." Id. at 232.

234.  On one occasion, she reported to Trustee Wilson that Zummo told her than Yagel called her a "Jew lover." Id. at 227-228.

235.  Wilson was "not shocked." Id. at 228.

VII.  **NYSDHR FINDS PROBABLE CAUSE OF RELIGIOUS DISCRIMINATION AGAINST PLAINTIFF**

236.  The New York State Division of Human Rights found probable cause that defendant discriminated against plaintiff on the basis of her advocacy for Jews. See Exhibit 1 to Sussman Affirmation.

VIII.  **PLAINTIFF'S TREATMENT CONTINUES ADJUDICATED ANTI-SEMITISM BY THE VILLAGE OF POMONA AND DEFENDANT YAGEL**

237.  The Village of Pomona and defendant Yagel were named defendants in Tartakoff, et al. v. Village of Pomona, et al., 138 F.Supp.3d 352 (S.D.N.Y. 2015).

238.  In his decision finding defendant Village liable for religious discrimination, Judge Karas found that the Village Board had enacted amendments to its zoning code with the substantial purpose to discriminate against the movement of Hasidic/Orthodox Jews into the Village. See Exhibit 2 to Sussman Affirmation.

239.  According to findings of fact rendered by Judge Karas following a ten day bench trial in which Yagel was represented in his official and individual capacities, "Before the Board voted on the proposed wetlands law, Village

residents began campaigning to become or remain members of the Board. Sanderson, Yagel, and Louie ran together on a slate in the March 2007 Village election. (See Pls.' FOF ¶ 275.)"

240. "A major piece of their platform was opposition to Tartikov's development of the Subject Property. (Id. ¶ 276.)"

241. "One campaign flier stated: This year it is imperative that all village residents vote for leadership that have an unwavering long-term commitment to the Village. We are, according to the lawyers for the Rabbinical College of Tartikoff who have purchased land on Route 306 in the village, going to be faced with a proposal for a huge development that will include housing for thousands of adult students and their families. Their lawyers have not been shy to point out that they will use every legal avenue to pursue their plans, including the federal statute RLUIPA. Fn.19 From what we know of the plan as it has been leaked to the public, it will have real environmental and safety problems; compelling interests that will allow the village to fight this plan, if and when presented to the Village Board. You need to vote for a team that is prepared to stand up to this threat of using the fundamentally unfair RLUIPA statute as a hammer against our village. A team that is in it for the long term, and one that has already prepared themselves with a strategy to fight for Pomona. (Pls.' Ex. 41.)"

242. "This same flier states that "[t]he single most important issue facing the Village is clearly the Tartikoff development." (Id.)"

243. "Sanderson, Yagel, and Louie vowed to "vigorously defend [the Village's] land use codes and regulations." (Id.)"

244. "A second flier reiterated these same concerns and made the same promises. (See Pls.' Ex. 42, at 2.)"

245. "In a campaign video, Sanderson stated that Tartikov "could completely change the village and the make-up of the village." (Pls.' Ex. 47, at 1.)"

246. Shortly before the election, Yagel and Louie drafted a submission for The Journal News editorial page, (see Pls.' FOF ¶ 286), stating their opposition to Tartikov's proposal and noting that "a virtual mini-city within the village[] that will house thousands of homogenous individuals" was not a "'natural' progression" for the Village. (Pls.' Ex. 17.)"

247. "Yagel was also quoted in the New York Times describing Plaintiff's plans for the Subject Property as "disgusting." (Pls.' Ex. 169, at 1 (internal quotation marks omitted).)"

248. "Sanderson, Yagel, and Louie won the March 2007 election. (Joint Pretrial Order Stipulations of Fact ¶ 22.)"

249. A short time after his election to office, Yagel voted to adopt the 2007 Wetland Law.

250. ""The Wetlands Law restricts Tartikov's use of the Subject Property because the location of the driveway onto the property falls within the 100-foot

buffer mandated by that law. (See Trial Tr. 1018.) An access road cannot be built in any other location because of the presence of wetlands and steep slopes, which would require significant regrading. (See id. at 781, 1017–18; Pls.' Ex. 1510 ("Beall Decl.") ¶¶ 264–65.)"

251.  Judge Karas made additional findings of fact related to Mr. Yagel and the Village: "The Wetlands Law, the relevant provisions of which were adopted in April 2007 (Local Law No. 5 of 2007), was enacted despite the fact that there is no evidence that the Village conducted any studies prior to the adoption of the law to determine where the Village's wetlands were, what threats they faced, or how best to protect them. Village officials did, however, know there were wetlands located on the Subject Property before the law was adopted, (see Trial Tr. 670 (Marshall stating that he knew there were wetlands on the Subject Property prior to 2007); Pls.' Ex. 69, at 1 (email from Yagel discussing the presence of wetlands on the Subject Property); Pls.' Ex. 104, at 1 (Marshall noting, in January 2002, that there are wetlands on the Subject Property); Pls.' Ex. 107, at 2 (October 22, 2001 Board meeting minutes noting that Marshall "stressed" that YSV needed to protect the wetlands located on the Subject Property); Pls.' Ex. 141, at 20 (1997 Update to the Village's Master Plan noting that the Subject Property contains "part of a large State-regulated wetland")), indicating that this law was designed to prevent Tartikov from building its proposed rabbinical college."

252.  The district court noted, "Further evidence that the Village passed the Wetlands Law to target Tartikov is found in the scope of the law's provisions. The law exempts from its coverage residences improved with single family residences. See Village Code § 126-3(D) ("The aforesaid [100] foot buffer in which regulated activities are not permitted to take place shall not apply to lots that are improved with single-family residences.") In the Village, there are 1,156 parcels of land, with 285 of them located within 100 feet of mapped wetlands. (See Beall Decl. ¶ 180.) Of those 285 parcels, 240 of them are improved with single family residences, leaving a maximum of 45 parcels subject to regulation. (See id. ¶¶ 180–81.) The fact that the Subject Property just so happens to be one of the 45 parcels subject to regulation is telling."

253. "Also troubling is the Village's decision to adopt a law relating to wetlands in 2007, after it learned of Tartikov's proposed use, despite the fact that it considered passing a similar law in the 1990s. (See Ulman Aff. ¶ 92.) It was not until Tartikov came along that such a law became "necessary" to prevent the unidentified risks to the Village's unidentified wetlands."

254.  Judge Karas found more than circumstantial evidence that the Village engaged in intentional religious discrimination in 2007, when it enacted the wetlands law, writing, "The Court need not rely solely on this circumstantial evidence to conclude that the Wetlands Law was conceived of and passed with a discriminatory purpose. Village officials explicitly stated their intent to thwart Tartikov's plans. Between the time the Wetlands Law was first proposed and

47

the time that it was adopted, Sanderson, Louie, and Yagel indicated in campaign materials that voters needed to "stand up to the threat" that Tartikov posed, further stating "[y]ou need to vote for a team that is prepared to stand up to this threat of using the fundamentally unfair RLUIPA statute as a hammer against our village." (Pls.' Ex. 41.) Sanderson also specifically indicated in a campaign video that the rabbinical college "could completely change the village and the make-up of the village." (Pls.' Ex. 47, at 1 (emphasis added).) The campaign materials for all three candidates indicated that "the single most important issue facing the village [was] clearly the Tartiko[v] development." (Pls.' Ex. 41.) Sanderson, Louie, and Yagel won the election in March 2007, (see Joint Pretrial Order Stipulations of Fact ¶ 22), and, at least, Yagel and Louie voted in favor of passing the Wetlands Law, (see Defs.' Post-Trial Brief ("Defs.' Mem.") 19 (Dkt. No. 323))."

255. The judge noted, "In addition to these comments, Plaintiffs have identified a number of other statements by Village officials indicative of Defendants' prejudice against Tartikov and Orthodox/Hasidic Jews, see Yeshiva Chofetz Chaim Radin, Inc. v. Village of New Hempstead, 98 F. Supp. 2d 347, 355 (S.D.N.Y. 2000) (holding that "discriminatory comments by the [m]ayor . . . present grounds for allowing a jury to judge the credibility, and motivation, of the [m]ayor . . . as well as the motivation that can be attributed to the [v]illage itself in passing the disputed provisions"), including:

• In February 2007, Yagel and Louie authored a letter to The Journal News stating that "a virtual mini-city within the village . . . that will house thousands of homogenous individuals" was not a "natural" progression for the Village. (Pls.' Ex. 17 (internal quotation marks omitted).) Yagel was also quoted in the New York Times stating that it was "disgusting" that Tartikov was "trying to create [a] mini city in our village." (Pls.' Ex. 169, at 1 (internal quotation marks omitted).)19

• Sanderson has publicly stated that the Village should "maintain[] its cultural and religious diversity." (Pls.' Ex. 146 ¶ 106 (internal quotation marks omitted).) However, Sanderson is unaware whether any Hasidic Jews live in the Village. (See Trial Tr. 559.)

• Leslie Sanderson, who served as Village Clerk, testified that she was worried Tartikov would "usurp" the Village and Board of Trustees. (Trial Tr. 543.) • Louie made a Facebook post which indicated discriminatory animus towards the Orthodox/Hasidic Jewish population. (See Pls.' Ex. 72.) See Tartikov II, 138 F. Supp. 3d at 392–93."

256.  As in the instant case, where Yagel has made efforts to disguise his discriminatory intent through the use of various code words, Judge Karas noted, "Significantly, these statements were made despite Defendants' efforts to refrain from publicly making disparaging or discriminatory comments. (See Pls.' Ex. 13, at 1 (email from Yagel to Louie and Sanderson noting that they "[m]ust be very careful about what we say" because they "[d]on't know who is in

the audience"); Pls.' Ex. 146 ¶¶ 110–11 (admitting that Louie and Yagel told "everyone" at a Pomona Civic Association meeting that they "must be careful about their statements").)"

257.  In footnote 19, commenting on the newspaper quotations cited above of Yagel, the district court wrote, "Defendants take solace in the fact that these statements were admitted as exhibits, but not for the truth of the matters asserted. However, these statements were offered, and admitted, not for their truth, but because they reveal Yagel's and Louie's animus toward Tartikov and Orthodox/Hasidic Jews."

258.  Nor was the Village of Pomona's conduct in showing hostility toward Orthodox Jews demonstrated only by and through the Tartikov matter.  Judge Karas made the following findings of fact concerning the Village: "Defendants' behavior with respect to other proposed projects is indicative of their intent to thwart the expansion of the Orthodox/Hasidic community. The Village has a demonstrated history of opposing various Orthodox/Hasidic Jewish land uses near the Village. As early as 1996, the Village opposed the expansion of Bais Yaakov, an Orthodox Hasidic yeshiva in Ramapo. (See Pls.' Ex. 125, at 7.) The Village wrote a letter in opposition to the expansion, attended a Ramapo meeting and read an opposition statement, challenged the expansion in court, and encouraged Village residents to object to the expansion. (See id. at 7–8; see also Trial Tr. 808 (Ulman affirming that the Village encouraged opposition to the expansion of Bais Yaakov).) In 1999, the Village did not object to the "Anna

Mann" property becoming an assisted living facility, but then when it was later proposed that the property be used for a yeshiva, the Village did oppose the development. (See Trial Tr. 802.) In 2004, as noted above, the Village opposed Ramapo's Comprehensive Plan and the ASHL. (See Pls.' FOF ¶¶ 136–38, 141.) The Village also expressed opposition to the development of three yeshivot outside of the Village. (See Trial Tr. 808–11.) The Village does not, however, have this same history of opposition when it comes to non-Orthodox/Hasidic land uses. In 2001, Marshall informed residents that they had to accept group homes within the Village because such land uses were protected under the FHA. (See Trial Tr. 614.)21 In May 2002, the Board, with the exception of one Trustee, informally approved Barr Laboratories' purchase of land within the Village to erect an office building, even 21 The Village did not provide similar instructions with regard to RLUIPA. Instead, it passed a resolution in February 2007 asking Congress to revisit the law. (See Pls.' Ex. 58.) though the land was zoned residential. (See Pls.' Ex. 124, at POM0002022.) Furthermore, on the same day it adopted Local Law No. 1 of 2007, the Board voted in favor of applying for funds to create a senior citizen center within the Village. (See Pls.'s Ex. 75, at POM0016278.)

259.  And, before Judge Karas village attorney Ulman "testified that the Village has "consistently opposed high-intensity development," (Ulman Aff. ¶ 16), as a means of showing that the Village opposes large developments regardless of who proposes them, but the fact remains that the Village has consistently

opposed proposals by Orthodox/Hasidic Jews." Judge Karas rejected this testimony as pretextual, masking discriminatory intent.

260. Judge Karas also made findings of fact that Yagel gave false testimony in attempting to claim a non-discriminatory purpose for the wetland amendment he favored, "Defendants also cite to the testimony of Sanderson, Yagel, and Louie to argue that the Wetlands Law was not meant to discriminate against Tartikov. (See Defs.' Mem. 19.) Sanderson testified that the law was not passed with the intention of keeping Tartikov out of the Village. (See Trial Tr. 521.) The Court does not credit this testimony because Sanderson ran for mayor on a platform that included a promise to fight to keep Tartikov from developing the Subject Property and expressed concerns about the "make-up" of the Village changing if Tartikov were to build on the property. (See Pls.' Ex. 41; Pls.' Ex. 47, at 1.) Yagel similarly testified that the Wetlands Law was not adopted to prevent Tartikov from building a rabbinical college, (see Trial Tr. 728), and also that he was unaware of the existence of wetlands on the property, (see id. at 727). The Court does not credit this testimony, and in one respect, it is false. The Court does not credit Yagel's testimony that the law was not adopted to discriminate against Tartikov because Yagel made discriminatory comments leading up to the adoption of the law. For example, in early 2007, Yagel co-authored a letter to The Journal News stating that "a virtual mini-city within the village . . . that will house thousands of homogenous individuals" was not a "natural" progression for the Village, (Pls.' Ex. 17 (internal quotation marks omitted)), and was quoted in the New York Times saying that it was

"disgusting" that Tartikov was "trying to create this minicity in our village," (see Pls. Ex. 169, at 1 (internal quotation marks omitted)). The Court does not credit the remainder of Yagel's testimony because it is demonstrably false. As indicated in the preceding paragraph, Yagel discussed the existence of wetlands on the Subject Property in January 2007. (See Pls.' Ex. 69, at 1, 3.)."

261.  In affirming in part Judge Karas' decision, the Court of Appeals for the Second Circuit stated as follows: Yagel ran in 2007 village elections as part of a slate  with two other candidates who campaign on a promise to stand up to the threat posed by a Jewish religious corporation, TRC, a rabbinical college, which proposed to build a Torah community designed to isolate students from distractions and surround them with others engaged in the same study. The slate called RLUIPA "fundamentally unfair" and its deployment against the Village of Pomona "a hammer against our village." See Exhibit 3 to Sussman Affirmation at 50.

Respectfully submitted,

MICHAEL H. SUSSMAN [3497]

SUSSMAN & ASSOCIATES
PO BOX 1005
GOSHEN, NY 10924
(845)-294-3991

Counsel for Plaintiff